289 F.2d 439
 Carolyn M. DODSON, an infant who sues by Sarah B. Brooks,
her next friend, Melvina Hamilton and Gloria
Hamilton, infants who sue by Gertrude
Hamilton, their next friend,
et al., Appellants,
v.
SCHOOL BOARD OF CITY OF CHARLOTTESVILIE, and Fendall R.
Ellis, Division Superintendent of Schools of the
City of Charlottesville, Virginia, Appellees.
 No. 8238.
 United States Court of Appeals Fourth Circuit.
 Argued Jan. 20, 1961.
Decided April 14, 1961.
 
 S. W. Tucker, Emporia, Va. (Oliver W. Hill, Richmond, Va., on brief), for appellants.
 John S. Battle, Jr., Richmond, Va. (Bremner, Neal, Harris, Williams & Battle, Richmond, Va., on brief), for appellees.
 Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.
 SOBELOFF, Chief Judge.
 
 
 1
 Ten Negro pupils attending public schools in the City of Charlottesville, Virginia, prosecute this appeal from the action of the District Court sustaining the School Board's denial of their applications for enrollment in white schools of that city. The appellants also seek judicial re-examination of the desegregation plan presently in effect in Charlottesville.
 
 
 2
 A brief account of the progress of desegregation in Charlottesville would be helpful before discussing the merits of the instant appeal. The District Court, in 1956, enjoined the Charlottesville School Board from using a racial basis to regulate or affect the admission or enrollment of Negro children in any public school operated by the Board. This court affirmed the decree, School Board of City of Charlottesville, Va. v. Allen, 4 Cir., 1956, 240 F.2d 59, certiorari denied School Bd. of Arlington County v. Thompson, 1957, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664, and we expressly stated that school assignments must not be based on race or color, 240 F.2d at page 64. Then, in September, 1958, the District Judge ordered ten Negro pupils to be assigned to Venable School, a previously all white elementary school, and two to Lane, the city's previously all white high school. However, the twelve Negroes did not attend, as those two schools were closed on September 22, 1958, by the Governor, in accordance with state laws requiring the closing of any school that became integrated. These laws were declared unconstitutional on January 19, 1959, by both state and federal courts. See Harrison v. Day, 1959, 200 Va. 439, 106 S.E.2d 636, and James v. Almond, D.C.E.D.Va.1959, 170 F.Supp. 331.
 
 
 3
 Thereupon the School Board applied to this court for a stay of Judge Paul's order of September, 1958, so that it could prepare and submit to the District Court a plan for desegregating the Charlottesville public schools. The Board also agreed to furnish the twelve plaintiffs in that case whatever tutoring would be necessary to prepare them for admission to white schools in the coming school year. Under these conditions, this court granted a stay. See School Board of City of Charlottesville v. Allen, 4 Cir., 1959, 263 F.2d 295.
 
 
 4
 On February 18, 1959, the School Board adopted and put into effect what it designated as a 'plan of desegregation.' It was therein explicitly stated that '(no) pupil shall be denied admission to any public school of this city on the ground of race or color * * *.' For elementary school purposes, the plan divided the city into six geographical zones, each served by one of the city's six elementary schools.[1] A child living in a particular zone would attend the school located in that zone and serving it, except that the school superintendent could assign a child to a school in another district if the pupil and his parents indicated such a preference and if the superintendent found that such assignment was in the pupil's best academic interests.
 
 
 5
 The city maintains two public high schools, Lane and Burley. Prior to the desegregation plan, Lane had been an all white school and Burley all Negro.[2] Under the plan, no geographical districts were created for the high schools. The only criteria established by the plan for the assignment of high school students were that the superintendent might consider the preference of the pupil and his parents, and should be guided by the pupil-teacher ratio in the schools, convenience of attendance and academic qualifications.
 
 
 6
 The plan went on to provide that upon the assignment of any pupil to a school his parents could request a transfer to another school, and in acting on such request the superintendent should take into account the pupil's residence, academic qualifications, personal desires, his needs for particular courses, the enrollment at the various schools, their available teaching personnel and physical facilities, 'and other lawful and objective considerations.' Finally, the plan provided that: 'The superintendent may adopt such administrative procedures as he may think advisable to further the purposes of this plan so long as they are applicable to white and Negro pupils alike and to the same extent in the case of one as in the case of the other * * *.'
 
 
 7
 Since the adoption of the plan, and under it, there has been some progress towards desegrating the city's schools. Although the actual number of Negroes attending previously all white schools has been relatively small, a significant start has been made. For the 1959-1960 school year, nine Negro elementary school pupils were assigned to Venable, a previously all white school, and three Negroes were assigned to Lane, the previously white high school. For the 1960-1961 year, three Negroes were assigned to the first grade at Venable, one of the three having been one of those assigned there the previous year but who failed to be promoted. Five other Negro children who had been assigned to Venable the preceding year were again assigned there. In addition, five Negro pupils who had previously been attending the Jefferson school, the colored elementary school, were granted transfers to Venable. Also, for the 1960-1961 year, three Negroes who were in Lane High School the previous year were re-assigned there, two other Negro students were initially assigned to Lane, and two applications for transfer from Burley to Lane were granted.
 
 
 8
 Turning now to the ten appellants, they are all students whose applications for assignment to all white or predominantly white schools were rejected by the superintendent. Four of them attend elementary schools and six are high school pupils. All four elementary school children had been and are now enrolled in the Jefferson school which is still attended exclusively by Negroes. They all reside in the district served by Jefferson. However, two sought to transfer to Johnson Elementary School, attended solely by white children, and two attempted to transfer to Venable, attended predominantly by whites. Their applications for transfer were denied because of their residence in the Jefferson district. The applications of four of the appellants for enrollment in Lane, the high school attended predominantly by whites, rather than Burley which is still attended exclusively by Negroes, were denied because of academic qualifications. As to these four, the record reveals that their level of academic achievement, based upon the Iowa Silent Reading Test and the California Test of Mental Maturity, was substantially below the average of the pupils attending Lane High School. The remaining two appellants were denied assignment to Lane because they resided much closer to Burley.
 
 
 9
 In Jones v. School Board of City of Alexandria, Virginia, 4 Cir., 1960, 278 F.2d 72, this court expressly recognized that residence and academic attainment tests may be applied in determining what schools children shall attend, provided that factors of race and color are not considered. In the case now before us, six of the appellants, as we have seen, were assigned to the appropriate schools based upon their residence, and the remaining four undoubtedly have academic definiencies. In the absence of some otherwise discriminatory application of these criteria, they would appear to have no cause for complaint. Moreover, the desegregation plan on its face is not objectionable on constitutional grounds since it provides a reasonable procedure without consideration of race or color by which school assignments are to be regulated.
 
 
 10
 However, the record reveals serious constitutional infirmities in the manner in which the plan is being administered. In some respects, in fact, the school authorities are applying the plan directly contrary to its express provisions.
 
 
 11
 At the elementary school level, the plan contemplates that every child, regardless of race, shall be sent initially to the school of the district in which he lives, and after such initial assignments, there may be transfers if the parents so request and the superintendent approves. This is a perfectly acceptable method of making school assignments, as long as the granting of transfers is not done on a racially discriminatory basis or to continue indefinitely an unlawful segregated school system. However, in administering the plan, the school authorities are departing from this contemplated arrangement. Negro pupils residing in the Jefferson district are initially assigned to the Jefferson school. They are not permitted to transfer to one of the other schools. Similarly, white pupils living in one of the other five districts are initially assigned to the school of their residence district, and likewise are not permitted to transfer. So far, except for not permitting transfers, this is in accordance with the plan and would seem to be constitutionally permissible. But, Negro pupils living in one of the five districts other than Jefferson are not, as are whites, initially assigned to the school of their district but to Jefferson. To attend the school where they reside, these students must then apply for transfers-- a procedure to which whites are not subjected. Also, white children living in the Jefferson district are not initially assigned to Jefferson, as Negroes living there would be, but go directly to one of the other schools. To attend Jefferson, they also would have to make application for transfers. This administration of the plan, which appears to contradict its express provisions, cannot indefinitely continue.
 
 
 12
 The cases have without exception condemned assignment systems where criteria are not applied equally to whites and Negroes in the same situation. See, e.g.: School Board of the City of Charlottesville, Va. v. Allen, 4 Cir., 1956, 240 F.2d 59; Hamm v. County School Board of Arlington County, Va., 4 Cir., 1959, 264 F.2d 945; Mannings v. Board of Public Instruction, 5 Cir., 1960, 277 F.2d 370; Jones v. School Board of City of Alexandria, Virginia, 4 Cir., 1960, 278 F.2d 72; Hill v. School Board of City of Norfolk, Virginia, 4 Cir., 1960, 282 F.2d 473. , in the instant case, the residence criterion is not being so applied. Negroes living in the Jefferson district must attend the school of that district whereas whites are initially assigned elsewhere. Negroes living in one of the other five districts are automatically assigned to Jefferson and must apply for transfer to the schools serving their residence zones, but whites in one of these zones authomatically are assigned to the schools in their respective zones. There can be no question that these practices are forbidden by the Fourteenth Amendment to the Constitution of the United States.
 
 
 13
 In respect to the assignment of students to high schools, the application of the plan is even more offensive to the constitutional rights of Negroes. All white students are automatically assigned initially to Lane High School, regardless of their place of residence or level of academic achievement. All white public high school students in the city presently attend Lane. Absolutely no assignment criteria are applied to them. On the other hand, residence and academic achievement criteria are applied to Negro high school pupils. As the plan is presently administered, if a colored child lives closer to Burley than to Lane, he must attend Burley High School. Moreover, even if a Negro student does live closer to Lane, he may not be permitted to attend it unless he performs satisfactorily on scholastic aptitude and intelligence tests-- a hurdle white students are not called upon to overcome.
 
 
 14
 Such administration of public school assignments is patently discriminatory. As pointed out previously, the law does not permit applying assignment criteria to Negroes and not to whites. We recently stated in Jones v. School Board of City of Alexandria, Virginia, 4 Cir., 1960, 278 F.2d 72, 77, speaking of the criteria of residence and academic preparedness:
 
 
 15
 'On the other hand, these criteria could be used in such a way as to be a vehicle for frustrating the constitutional requirement laid down by the Supreme Court. If this is later shown to be the case, then the action of the School Board would not escape the condemnation of the courts. If the criteria should be applied only to Negroes seeking transfer or enrollment in particular schools and not to white children, then the use of the criteria could not be sustained. Or, if the criteria are, in the future, applied only to applications for 'transfer and not to applications for initial enrollment by children not previously attending the city's school system, then such action would also be subject to attack on constitutional grounds, for by reason of the existing segregation pattern it will be Negro children, primarily, who seek transfers.'
 
 
 16
 Because of the unconstitutional application of the assignment criteria, as clearly revealed by this record, we would normally be required to reverse. However, the Charlottesville school authorities have not attempted to defend the present method of assigning pupils as a permanent assignment system. They insist that it is not a pupil assignment plan meant to continue indefinitely but rather a plan by which they intend in good faity to achieve as promptly as possible the desegregation of their schools, as required by law. As pointed out above, a significant start in this direction has been made. In addition, a large proportion of the assignments of Negro children to previously all white schools has been made on the initiative of the school authorities themselves. We recognize that they have made a genuine effort to begin desegregation.
 
 
 17
 Moreover, the able and conscientious District Judge was entirely aware of the infirmities in the present application of the criteria. During the course of the trial, he pointed out that they were not being applied equally to white and Negor children and that this was a deprivation of the constitutional rights of the Negro pupils. He gave weight, however, to the fact that the school authorities had evidenced an intention to comply with the law and expressed his hope that this course would continue. The Judge retained the case on the docket for such future action as may be necessary. He will be able to re-examine the situation prior to the opening of the schools in the coming year.
 
 
 18
 In light of these factors, and as the particular assignment procedures were designed to be temporary measures only, well will at this time affirm the decision of the District Court. The action we take is based on the particular history and circumstances associated with this case. In appeals involving school desegregation problems, where the Supreme Court has permitted a period of transition for the desegregation of schools, each case is to some extent dependent on its own particular facts. The attitude of particular school authorities, their past conduct, the progress they have been making, the varying administrative difficulties that may be shown to exist in different localities, the court's view as to the officials' future intentions, and other factors must be taken into consideration. In the instant case we are confident that steps will be taken promptly to end the present discriminatory practices in the administration of the desegregation plan.
 
 
 19
 Affirmed.
 
 
 
 [1]
 The six elementary schools are: Jefferson, Venable, Johnson, Burnley Moran, Clark and McGuffey
 
 
 [2]
 The Burley school, although located within the City of Charlottesville, was and still is supported and controlled in part by the adjoining County of Albemarle. However, neither side has suggested that this has any legal significance with respect to the issues of this case