Cynthia D. GREEN, an infant, and Rev. Emmett L. Green, her father and next friend, et al., Appellants,

v.

SCHOOL BOARD OF the CITY OF ROA-NOKE, VIRGINIA, a body corporate, et al., Appellees.

No. 8534.

United States Court of Appeals Fourth Circuit.

Argued March 26, 1962.

Decided May 22, 1962.

James M. Nabrit, III, New York City (Jack Greenberg, New York City, and Reuben E. Lawson, Roanoke, Va., on brief), for appellants.

A. B. Scott, Richmond, Va. (Peyton, Beverley, Scott & Randolph, Richmond, Va., on brief), for Pupil Placement Board, appellee.

Sidney F. Parham, Jr., Roanoke, Va. (Woods, Rogers, Muse & Walker and Ran G. Whittle, City Atty., Roanoke, Va., on brief), for Roanoke City School Board and Division Superintendent, appellees.

Before SOBELOFF, Chief Judge, and BOREMAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

This action was begun in the District Court for the Western District of Virginia by twenty-eight Negro public school pupils and their representatives in the City of Roanoke to require the defendants to grant them transfers from Negro to white schools. The plaintiffs also prayed for an injunction against the continued operation of racially segregated schools in the city or for an order requiring city and state school officials to submit and effectuate a plan for desegregation.

Before turning to the facts pertaining to these plaintiffs, it is in order to describe the operation of the Roanoke public school system, as revealed by the rec-

ord. The Virginia Legislature has by statute entrusted authority for the enrollment and placement of pupils in the state to the Pupil Placement Board located in Richmond, Va.Code Ann. § 22–232.1—232.17 (Supp. 1960), unless a particular locality elects to assume sole responsibility for the assignment of its pupils. Va.Code Ann. § 22–232.18–232.-31 (Supp. 1960). However, the Roanoke City school board has not elected to assume this responsibility, and insists that legal responsibility for assignments is in the state board.

In practice, the state Pupil Placement Board's role in the assignment of pupils is largely a formality. The Roanoke City school officials make recommendations to the Pupil Placement Board as to the assignment of every pupil in the city. If the parents or guardians do not object to the recommended assignments, the recommendations are routinely approved by the state board. In fact, such recommendations are not even presented to the three members of the state board, but are automatically approved by the state board's staff. Nor do the state board members concern themselves with the criteria applied by the local school authorities in making recommendations. In this way, as many as 10,000 pupils have been assigned to schools by the state board in a single morning. Only when recommendations of the local officials are protested by parents, or, as is the case with some applications for transfer from one school to another, when the local officials fail to make any recommendations at all, do the members of the state Pupil Placement Board personally consider individual assignments.

The scheme employed by the school officials in Roanoke City in making their recommendations is aptly called the "feeder" system. The city schools are divided into six sections, numbered I to VI. A pupil, when he first enters the city's school system, is assigned to an elementary school in one of the sections. When he graduates from the elementary school, he is automatically assigned to the junior high school which serves that

same section. Similarly, upon graduation from junior high school, he goes to his section's senior high school. Under this arrangement, the initial assignment of a pupil to an elementary school effectually determines what schools he will attend during his entire school career, unless he succeeds in obtaining a transfer to a school in another section. These sections, however, serve no specifically defined areas. The city school superintendent stated that initial assignments to elementary schools are in accordance with what he called a "neighborhood" system: pupils simply go to the school in their vicinity. While the superintendent admitted that he could produce no map describing the sections on the basis of definite geographical boundaries, he asserted that the principal of each school knows the neighborhood his school serves. However, when it comes to Negro pupils, there is no relationship between these sections and the vague geographical neighborhoods. Rather, all Negroes are initially assigned to schools in section II, and graduate to section II junior and senior high schools. And no whites attend schools of that section. In other words, the "neighborhood" served by section II schools consists of the entire Negro community in the city.

As previously pointed out, recommendations by the city officials for assignment in accordance with this system are routinely approved by the state Pupil Placement Board. When recommendations by the local officials for assignments are protested by parents, or when the local officials make no recommendations, as noted before, the members of the state Pupil Placement Board personally consider the assignments. This, it was estimated, happens in only 1/100 of 1% of the total number of assignments. Before making any decisions, the state board requests the local officials to furnish additional information about each pupil. Included in the information requested are the occupations of the parents, the schools attended by the pupil's brothers and sisters, the distances between the pupil's home and both the

school he presently attends and the school he wishes to attend, his scholastic aptitude and achievement as revealed by standard, state-wide tests and by his grades, and the comments of the pupil's former teachers. An informal meeting is then held by the state board with the local school officials, and, on the basis of this information, the state board passes on the application. The manner in which the state board applies this information in reaching a decision can best be illustrated by the cases of the twenty-eight plaintiffs and eleven others who, in 1960, applied for transfers.

Prior to 1960, the Roanoke City schools were completely segregated, with all Negro pupils attending section II schools and all whites attending schools in the other five sections. In that year, the thirty-nine Negro pupils, including the twenty-eight plaintiffs, filed applications for transfers to all-white schools. These were forwarded to the state board without recommendations. The state board then requested from the local authorities the information concerning residence, aptitude, and so forth. When the Roanoke City school superintendent asked to be advised more specifically what information was desired, a member of the state board replied with revealing candor that the board wanted information to help them answer three questions, described in the following testimony of the school superintendent:

"Are there Negro pupils who cannot be excluded from attending white schools except for race? That is number one. Number two: Would the Superintendent and School Board so certify to the Pupil Placement Board? Number three: And in our judgment, what would happen in the local communities if some Negro pupils were assigned to white schools? Those were the three questions."

The requested data was transmitted, and subsequently, on August 15, 1960, at a meeting of the state board with the city superintendent, the latter expressed his judgment as to which applications could not be denied but for race and which could. In every case, these judgments were effectuated as the actions of the state board. Of the thirty-nine applications, the state board granted nine and denied thirty. These nine were the first Negroes to be admitted to white schools in Roanoke City since the Supreme Court's decisions in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Most of the parents of the thirty-nine pupils were notified of the board's decision on August 17, 1960, and the remainder on August 22. Thereupon, the parents of twenty-eight of the thirty pupils whose applications had been denied filed the present action in the District Court.

With respect to the nine Negro children who were granted transfers, the minutes of the state Pupil Placement Board recite that the local school authorities, applying "criteria and standards * * * which are regarded by this Board as valid and reasonable, * * * are not in a position to oppose legally the * * * assignments and transfers * * *." As to the twenty-eight plaintiffs, their applications were denied for a variety of reasons.[1] Eleven were rejected on the ground that they lived closer to the Negro school to which they were assigned than to the white schools they wished to attend, although actually one of the eleven lived a block closer to the white school and another lived equidistant between the two schools. Twelve of the plaintiffs were denied transfers because the results of their aptitude and achievement tests placed them below, or in a few cases only slightly above, the median of the classes in the white schools they wished to attend. Five were refused on the ground that, although the applicants had otherwise met the board's standards, each had a brother or sister

1. The record does not reveal the reason for the board's denial of the applications of the two pupils who did not join as plaintiffs in this action.

attending the same school with him, whose aptitude and achievement tests were below the median of the comparable white classes. The board professed to rely upon these "standards," other than the residence requirement, to avoid placing any Negroes in white schools "who would be failures."

In the District Court, the defendants first contended that the suit should be dismissed because the plaintiffs, after their applications were denied, did not further protest against the assignments by the state board and seek a hearing in accordance with the provisions of section 22–232.8 of the Pupil Placement Act. Va.Code Ann. § 22–232.8 (Supp. 1960). The court, however, rejected this argument, stating: "In this case, the transfer requests were denied five or six days prior to the commencement of the school term. Obviously there was insufficient time to have heard a protest if one had been filed." While the defendants have not renewed this particular argument, both parties in their briefs before this court have raised and argued more general questions concerning the procedural adequacy of the administrative remedies and the necessity for exhausting them. However, we think that the above-quoted answer of the District Court fully meets the particular question with respect to these plaintiffs, and thus it is unnecessary to deal with or decide broader issues concerning administrative remedies. The District Court also denied the plaintiffs' prayers for an injunction against the continued operation of a racially segregated school system or for an order requiring a plan for desegregation.

The court ruled on the denials of the plaintiffs' applications as follows: As to the eleven who were denied transfers on the ground of residence, the District Court sustained the defendants' actions. In regard to the twelve plaintiffs whose applications were denied on the basis of academic qualifications, the court upheld the denial as to one who had performed very poorly in the aptitude test, ordered the admission of one who was academically well above the median of those pupils in the white school to which she was applying, and ordered the state board to re-examine the applications of the other ten. With respect to the five plaintiffs whose applications were denied because they had brothers or sisters attending the Negro school to which they had been assigned, the District Court also ordered the state board to re-examine the applications. Of the fifteen applications thereafter re-examined by the state board, five were allowed by the board and ten denied, leaving a total of twenty-two plaintiffs whose applications were denied. Of these, two were permitted to transfer to white schools for the 1961–62 school year, leaving twenty of the plaintiffs who have failed thus far to secure relief. These twenty are the appellants in the present appeal.

■■ This court has on several occasions recognized that residence and aptitude or scholastic achievement criteria may be used by school authorities in determining what schools pupils shall attend, so long as racial or other arbitrary or discriminatory factors are not considered. See, e. g., Dodson v. School Board of City of Charlottesville, Virginia, 289 F.2d 439, 442 (4th Cir., 1961); Jones v. School Board of City of Alexandria, Virginia, 278 F.2d 72, 75 (4th Cir., 1960). But if these criteria, otherwise lawful, are used in a racially discriminatory manner, the resulting assignment is not saved from illegality. As we have more than once made clear, school assignments, to be constitutional, must not be based in whole or in part on considerations of race. Dodson v. School Board of City of Charlottesville, Virginia, supra; Hill v. School Board of City of Norfolk, Virginia, 282 F.2d 473 (4th Cir., 1960); Jones v. School Board of City of Alexandria, Virginia, supra. The pupil assignment system in effect in the City of Roanoke, as administered by the joint efforts of the local school authorities and the state Pupil Placement Board, is, as demonstrated by the facts, infected throughout with racially discriminatory applications of assignment criteria.

All initial assignments of children enrolling in the city's school system are on a completely racial basis. Every white child is initially assigned to a school in a section other than section II, regardless of how near he might reside to a section II school. Every Negro child, on the other hand, is initially assigned to a section II school, regardless of his place of residence or any other criteria. The Negro child, if he desires a desegregated education, must thereafter run the gauntlet of numerous transfer criteria in order to extricate himself, if he can, from the section II schools. These are hurdles to which a white child, living in the same area as the Negro and having the same scholastic aptitude, would not be subjected, for he would have been initially assigned to the school to which the Negro seeks admission. In Jones v. School Board of City of Alexandria, Virginia, 278 F.2d 72, 77 (4th Cir., 1960), this practice was expressly condemned:

> " * * * if the criteria are, in the future, applied only to applications for transfer and not to applications for initial enrollment by children not previously attending the city's school system, then such action would also be subject to attack on constitutional grounds, for by reason of the existing segregation pattern it will be Negro children, primarily, who seek transfers."

Or, as we stated in Hill v. School Board of City of Norfolk, Virginia, 282 F.2d 473, 475 (4th Cir., 1960), where

> " * * * assignments to the first grade in the primary schools are still on a racial basis, and a pupil thus assigned to the first grade still is being required to remain in the school to which he is assigned, unless, on an individual application, he is reassigned on the basis of the criteria which are not then applied to other pupils who do not seek transfers * * *, such an arrangement does not meet the requirements of the law."

Steps must be taken to end this unlawful initial assignment arrangement which the record discloses to exist in the City of Roanoke. It is a racially discriminatory application of asssignment criteria to which all of the appellants were subjected.

Beyond the discrimination inherent in the initial assignment system, there appear to be constitutional infirmities with respect to the application of the criteria for transfers from one Roanoke school to another. The requirement that a Negro seeking transfer must be well above the median of the white class he seeks to enter is plainly discriminatory. The board's explanation that this special requirement is imposed on Negroes to assure against any "who would be failures" is no answer. The record discloses that no similar solicitude is bestowed upon white pupils. Similarly, the requirement that a pupil's brothers and sisters be above the median of corresponding classes in the school to which transfer is sought is invoked discriminatorily against only Negro children who seek to escape from segregated schooling. Moreover, the very manner of the state board, which seeks information concerning Negro applications for transfers, points up the extent that such applications are viewed differently from white applications. Specifically, the board wanted to know if there were any "Negro pupils who cannot be excluded from attending white schools except for race?" The board's preoccupation was with race, and its approach was to find some excuse for denying the Negroes' applications for transfers. A candid view of the record compels the observation that, as to white children, there is no comparable straining to ferret out some pretext for denying transfers.

The federal courts have uniformly held that such unequal application of transfer criteria is a violation of the Negro pupils' rights under the Fourteenth Amendment. As we stated in Jones v. School Board of City of Alexandria, Virginia, 278 F.2d 72, 77 (4th Cir., 1960):

"If the criteria should be applied only to Negroes seeking transfer or enrollment in particular schools and not to white children, then the use of the criteria could not be sustained." See Northcross v. School Board of City of Memphis, 302 F.2d 818, (6th Cir., 1962); Dodson v. School Board of City of Charlottesville, Virginia, 289 F.2d 439, 443 (4th Cir., 1961); Norwood v. Tucker, 287 F.2d 798, 803, 806–09 (8th Cir., 1961); Hill v. School Board of City of Norfolk, Virginia, 282 F.2d 473 (4th Cir., 1960); Mannings v. Board of Public Instruction, 277 F.2d 370, 374–375 (5th Cir., 1960); Hamm v. County School Board of Arlington County, Virginia, 264 F.2d 945, 946 (4th Cir., 1959); School Board of the City of Charlottesville, Virginia v. Allen, 240 F.2d 59, 64 (4th Cir., 1956).

In sum, the Roanoke City school officials, together with the state Pupil Placement Board, have administered a school system where pupils of the Negro race are classified in a separate category, are in the first instance completely segregated in their own attendance area, and are kept in that area, except for the few who can meet transfer standards which, for the most part, have no application to white pupils. "Obviously the maintenance of a dual system of attendance areas based on race offends the constitutional rights of the plaintiffs and others similarly situated and cannot be tolerated." Jones v. School Board of the City of Alexandria, Virginia, 278 F.2d 72, 76 (4th Cir., 1960). As administered, the Pupil Placement Law offends the constitutional rights of the plaintiffs and of others similarly situated. Thus, the individual appellants are entitled to relief, and also they have the right to an injunction on behalf of the others similarly situated. See School Board of the City of Charlottesville, Virginia v. Allen, 240 F.2d 59 (4th Cir., 1956), sustaining the right of the plaintiffs to obtain a general injunction against the school officials pro-

hibiting racial discrimination in the administration of the schools, and Frasier v. Board of Trustees of University of North Carolina, 134 F.Supp. 589, 593 (M.D.N.C.1955) (three-judge court), aff'd per curiam, 350 U.S. 979, 76 S.Ct. 467, 100 L.Ed. 848 (1956), ordering an injunction against discriminatory admissions to the University of North Carolina.[2]

As the defendants have disavowed any purpose of using their assignment system as a vehicle to desegregate the schools and have stated that there was no plan aimed at ending the present practices which we have found to be discriminatory, this case is quite unlike Hill v. School Board of City of Norfolk, Virginia, 282 F.2d 473 (4th Cir., 1960), and Dodson v. School Board of City of Charlottesville, Virginia, 289 F.2d 439 (4th Cir., 1961). In those cases, the assignment practices were defended as interim measures only and the district courts, recognizing the infirmities in the existing practices, made it clear that progress toward a completely non-discriminatory school system would be insisted upon. These factors are totally absent from the instant case.

However, if, upon remand, the defendants desire to submit to the District Court a plan for ending the existing discriminatory practices, then, rather than the appellants and others similarly situated all being entitled to immediate admission to non-segregated schools, their admissions may be in accordance with the plan. Any such plan, before being approved by the District Court, should provide for immediate steps looking to the termination of the discriminatory practices "with all deliberate speed" in accordance with a specified time table. Hill v. School Board of City of Norfolk, Virginia, 282 F.2d 473, 475 (4th Cir., 1960).

Reversed and remanded for proceedings consistent with this opinion.

2. Accord, Northcross v. Board of Education of City of Memphis, 302 F.2d 818 (6th Cir. 1962); Mannings v. Board of Public Instruction, 277 F.2d 370, 372–375 (5th Cir. 1960); Orleans Parish School Board v. Bush, 242 F.2d 156, 165 (5th Cir. 1957).