309 F.2d 630
 Warren H. WHEELER, an infant, and J. H. Wheeler, his father
and next friend; et al., and C. C. Spaulding, III,
an infant, and C. C. Spaulding, Jr., his
father and next friend; et
al., Appellants,
v.
DURHAM CITY BOARD OF EDUCATION, a body politic in Durham
County, North Carolina, Appellee.
 No. 8643.
 United States Court of Appeals Fourth Circuit.
 Reargued July 9, 1962.
Decided Oct. 12, 1962.
 
 Jack Greenberg, New York City (James M. Nabrit, III, Derrick A. Bell, Conrad O. Pearson, M. Hugh Thompson, William A. Marsh, Jr., J. H. Wheeler, and F. B. McKissick, Durham, N.C., on the brief), for appellants.
 Marshall T. Spears, Durham, N.C. (Spears & Spears, Durham, N.C., on the brief), for appellee.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.
 SOBELOFF, Chief Judge.
 
 
 1
 This appeal is from the disposition made by the United States District Court for the Middle District of North Carolina of two cases consolidated into a single trial and record. The first, Wheeler v. Durham City Board of Education, was brought in April, 1960, by 163 Negro pupils, and their parents, protesting the maintenance of segregated schools in the city during the 1959-60 school year. The second, Spaulding v. Durham City Board of Education, was instituted in September, 1960, by 116 Negro school children, and their parents, including many of the same individuals who filed the Wheeler suit, similarly protesting the continued segregation of the schools during the 1960-61 school year.
 
 
 2
 The complaint in each case requested an injunction against the continued assignment of pupils to schools on the basis of their race and against imposing upon Negro pupils seeking reassignment criteria which were not applied to white pupils seeking transfers. Both complaints also prayed for orders 'enjoining deterdants * * * from assigning plaintiffs to any school other than the one to which they would be assigned if they were white' and supplied, in the body of the complaints, complete lists of all plaintiffs, the school to which each had been assigned, and the school to which each would have been assigned if he were a white child.
 
 
 3
 In a lengthy opinion handed down on July 20, 1961, the District Court found that some of the practices of the Durham board of education were discriminatory. However, the court denied relief to all individual plaintiffs who had not exhausted administrative remedies, and, as to the remaining plaintiffs, the court ordered the board to re-examine their applications for reassignment.[1] Of the 133 transfer applications so re-examined, the board denied all but eight. In its supplemental opinion of April 11, 1962, the District Court refused to grant any further relief and dismissed the complaints, solely on the ground that the plaintiffs 'are still not seeking reassignment to any particular school,' but 'simply want nothing more or less than a general order of desegregation.'[2]
 
 
 4
 Indisputably, the record shows that, for the 1959-60, 1960-61, and 1961-62 school years, the Durham board of education assigned first grade children to racially segregated schools in accordance with dual attendance area maps. All Negro first graders were assigned to one of the seven Negro elementary schools on the basis of the map which indicated the Negro schools serving the zones created by it. A separate map divided the city into geographic zones to determine the distribution of white children among the ten white elementary schools. Pupils graduating from elementary school were assigned to segregated junior high schools, also apparently on the basis of zones fixed by these maps. As for students entering senior high school, the dual attendance area maps were not needed as there were in the city only two high schools, one reserved for white pupils and the other for Negroes. However, the maps were used in the assignment of pupils entering the Durham school system for the first time after previously attending school elsewhere.
 
 
 5
 All other pupils were assigned to the same schools they had attended the preceding year. Thus, once a child was assigned to the first grade in a segregated school pursuant to the dual attendance area maps, he would remain in that school. Upon his graduation from elementary school, the maps would place him in a segregated junior high school where he would continue until he was ready to complete his education in the segregated senior high school. Obviously, the practice of automatically reassigning pupils to the schools they attended the year before completed the plan, set in motion by the maps, for maintaining segregated schools. At the same time, it must be recognized that, once a Negro pupil successfully transferred to a white school, this practice also meant that he would continue in that school the following years.[3]
 
 
 6
 On this evidence, the District Court correctly held that resort to dual attendance area maps 'offends the constitutional rights of the plaintiffs,'[4] but ordered only that 'the board shall report to the court * * * any action it has taken with reference to the future use of dual attendance area maps.'
 
 
 7
 In direct response to the court's opinion, the board of education resolved, on July 27, 1961, 'that the future use of dual attendance area maps be discontinued, effective immediately.' The school superintendent was directed to make a study of the existing pattern of attendance at various schools and to recommend ways to establish new attendance areas. However, the board took no action to remedy the school assignments for the 1961-62 school year which had been made before the court's decision by use of the dual attendance area maps as outlined above. Moreover, the evidence shows that, despite the board's dutiful resolution, it has continued to utilize the dual attendance areas, if not the very maps themselves, to maintain segregated schools in the city.
 
 
 8
 Although the vast majority of children were assigned to schools for the 1961-62 year before both the District Court's opinion and the board's resolution, there were a number of pupils of both races who registered late and sought admission to the first grade after July 27. The following testimony of the superintendent of the Durham schools, taken in January, 1962, shows that these pupils were assigned to segregated schools in the same manner as if the dual attendance area maps had not been formally renounced:
 
 
 9
 'Q. And you use the same areas for all the first grade pupils entering this year? You use the same areas for these pupils assigned after July 27th that you used before, is that right? 'A. In most cases at least that would be true. (The superintendent explains that exceptions are necessarily made for crippled children.) 'Q. Generally these late registrants, people who didn't go to preregistration and were assigned after July, were assigned, on the basis of the same zones? 'A. In general that would be true, because that again in general would be the place to which they normally could go to ask to be admitted.'
 
 
 10
 These attendance areas, the superintendent went on to testify, were also used after the July 27 resolution to process the transfer applications submitted by reason of the pupil's change of residence.
 
 
 11
 The effectiveness of this system of initial assignments, coupled with the discriminatory transfer procedures, in maintaining racially segregated schools is graphically illustrated by the following figures gathered from the superintendent's testimony and from the records of the board of education. On October 31, 1961, there were 7,164 Negro pupils enrolled in the schools reserved for Negroes. No white pupil went to any of these schools. On the same day, there were 8,032 enrollees in the other schools in the system. Out of this group, only 15 were Negro. Six or seven Negroes were in the senior high school, six or seven in the junior high schools, and one in an elementary school. The rest of the children attending these schools were white.
 
 
 12
 The uncontradicted evidence in this case is irreconcilable with the statement of the District Court in its supplemental opinion of April 11, 1962, that 'the dual attendance area maps * * * have been eliminated.' The court's own finding of fact, clearly correct, that 'the defendant Board has not made any material change in its previous practice with respect to the initial assignments of first grade students * * *' further militates against the notion that the dual attendance areas have been eliminated. The inescapable conclusion from the evidence is that the assignment of pupils to the Durham public schools is based, in whole or in part, upon the race of those assigned. It is an unconstitutional administration of the North Carolina Pupil Enrollment Act to assign pupils to schools according to racial factors.[5]
 
 
 13
 This opinion could go on to discuss in detail the instances, abundantly appearing in the record, of unfairness and arbitrariness in the procedures imposed upon applicants for transfers to free themselves from the initial racial assignments. We find it unnecessary to burden the opinion with these details, for in Jeffers v. Whitley, 309 F.2d 621 decided today, we have declared the judicial relief that must be granted to school children who have ben initially assigned on a racial basis. See also, Dillard v. School Board of City of Charlottesville, 308 F.2d 920. Here, it is sufficient to state only that, for the reasons given in Jeffers, these plaintiffs are entitled to an order for their admission for the 1962-63 school year to the schools for which they have applied, to a declaratory judgment that the defendants are administering the North Carolina Pupil Enrollment Act in an unconstitutional manner, and to an injunction against the continuance of the board's discriminatory practices. The injunction shall control all future assignment of pupils to schools unless and until the defendants submit to the District Court a suitable plan for ending the existing discrimination. 'Any such plan, before being approved by the District Court, should provide for immediate steps looking to the termination of the discriminatory practices 'with all deliberate speed' in accordance with a specified time table.'[6]
 
 
 14
 Reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 196 F.Supp. 71 (M.D.N.C.1961)
 
 
 [2]
 210 F.Supp. 839 (M.D.N.C.1962)
 
 
 [3]
 However, the testimony of the superintendent of schools disclosed an instance of two Negro pupils, reassigned at their request to a white junior high school in 1959, who moved their residence to the immediate neighborhood of the Negro junior high school the day before school opened. They were not permitted to report at the white school to which they had been assigned, but they were immediately assigned back to the Negro school because of their change of residence, despite the fact that the unvarying practice in such circumstances was for the pupils to take the initial step by applying for a transfer
 
 
 [4]
 Marsh v. County School Board of Roanoke County, 305 F.2d 94 (4th Cir. 1962) Jones v. School Board of City of Alexandria, 278 F.2d 72, 76 (4th Cir. 1960)
 
 
 [5]
 Jeffers v. Whitley, 309 F.2d 621 (4th Cir. 1962); and see Marsh v. County School Board of Roanoke County, 305 F.2d 94 (4th Cir. 1962); Green v. School Board of City of Roanoke, 304 F.2d 118 (4th Cir. 1962); Dodson v. School Board of City of Charlottesville, 289 F.2d 439, 443 (4th Cir. 1961); Hill v. School Board of City of Norfolk, 282 F.2d 473, 475 (4th Cir. 1960); Jones v. School Board of City of Alexandria, 278 F.2d 72, 77 (4th Cir. 1960). For similar cases in other courts of appeals, see Northcross v. School Board of City of Memphis, 302 F.2d 818 (6th Cir. 1962); Norwood v. Tucker, 287 F.2d 798, 802-806, 809 (8th Cir. 1961); Mannings v. Board of Public Instruction, 277 F.2d 370, 374-375 (5th Cir. 1960)
 
 
 [6]
 Green v. School Board of City of Roanoke, 304 F.2d 118 (4th Cir. 1962)