317 F.2d 429
 Minerva BRADLEY, I. A. Jackson, Jr., Rosa Lee Quarles, John
Edward Johnson, Elihu C. Myers and Elizabeth S.
Myers, Appellants,
v.
The SCHOOL BOARD of the CITY OF RICHMOND, VIRGINIA, H. I.
Willet, Division Superintendent of Schools of the City of
Richmond, Virginia, and E. J. Oglesby, Alfred L. Wingo and
E. T. Justis, individually and constituting the Pupil
Placement Board of the Commonwealth of Virginia, Appellees.
 No. 8757.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 9, 1963.
Decided May 10, 1963.
 
 Henry L. Marsh, III, Richmond, Va. (S. W. Tucker, Richmond, Va., on brief) for appellants.
 Henry T. Wickham, Sp. Counsel, City of Richmond (J. Elliott Drinard, City Atty., Richmond, Va., and Tucker, Mays, Moore & Reed, Richmond, Va., on brief) for appellees, The School Board of the City of Richmond, Virginia, and H. I. Willet, Division Superintendent of Schools.
 Before BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges.
 BOREMAN, Circuit Judge.
 
 
 1
 This is a school case involving alleged racially discriminatory practices and the maintenance of public schools on a racially segregated basis in the City of Richmond, Virginia. In September 1961 eleven Negro pupils, their parents and guardians instituted this action to required the defendants to transfer the pupils from Negro public schools to white public schools.[1] The plaintiffs also pray, on behalf of all persons similarly situated, that the defendants be enjoined from operating racially segregated schools and be required to submit to the District Court a plan of desegregation. The District Court ordered that the individual infant plaintiffs be transferred to the schools for which they had applied. This appeal is based upon the refusal of the court to grant further injunctive relief.
 
 
 2
 Defendant, Virginia Pupil Placement Board, answered the complaint, admitting that plaintiffs had complied with its regulations pertaining to applications for transfer but denying discrimination and other allegations of the complaint. The defendants, School Board of the City of Richmond and the Richmond Superintendent of Schools, answered and moved to dismiss on the ground that sole responsibility for the placement of pupils rested with the Virginia Pupil Placement Board pursuant to the Pupio Placement Act of Virginia, Sections 22-232.1 through 232.17, Code of Virginia, 1950, as amended.[2]
 
 
 3
 The defendants interpreted the bill of complaint as attacking the constitutionality of the Pupil Placement Act and the motions to dismiss were grounded also on the theory that constitutionality should first be determined by the Supreme Court of Appeals of Virginia or the case should be heard by a District Court of three judges. The Court below correctly denied the motions to dismiss after determining that the constitutionality of the Act had not been challenged by plaintiffs.
 
 
 4
 The record discloses that the City of Richmond is divided into a number of geographically defined attendance areas for both white and Negro schools. These areas were established by the School Board prior to 1954 and have not been materially changed since that time. It is admitted that several attendance areas for white and Negro schools overlap. The State Pupil Placement Board enrolls and transfers all pupils and neither the Richmond School Board nor the city Superintendent of Schools makes recommendations to the Pupil Placement Board.
 
 
 5
 During the 1961-62 school term, 37 Negro pupils were assigned to 'white' schools. For the 1962-63 school term, 90 additional Negro pupils had been so assigned. At the start of the 1962-63 school term, all of the 'white' high schools had Negro pupils in attendance. Negro pupils also attend several of the 'white junior high schools and elementary schools.
 
 
 6
 Certain additional facts are clearly established by the record. The City School Board maintains five high schools, three for whites and two for Negroes; five junior high schools for whites and four for Negroes; eighteen elementary schools for whites and twenty-two for Negroes. As of April 30, 1962, there were 40,263 pupils in Richmond public schools, 23,177 Negroes, 17,002 whites and 84 non-whites of a race other than Negro but considered white for the purpose of assignment in the Richmond public school system. Only 37 Negroes were then attending schools which white children attended, 30 of those being in the 'white' Chandler Junior High School. Three of the remaining seven were in attendance at the 'white' John Marshall High School, one attended the 'white' Westhampton Junior High School and three handicapped children attended the Richmond Cerebral Palsy Center. With the possible exception of the three last mentioned, these children had sought transfers from Negro schools and all but one were able to satisfy the residential and academic criteria which the Pupil Placement Board applies in case of transfers but not in case of initial enrollment. The remaining child had been admitted by court order in eariler litigation.[3]
 
 
 7
 The 1961-62 Directory of the Richmond, Virginia, Public Schools shows 'White Schools' in one division and 'Negro Schools' in the other. The 'White Schools' are staffed entirely with faculties and officials of the Caucasian race. The schools listed as 'Negro Schools' are staffed entirely with faculties and officials of the Negro race.
 
 
 8
 Thus it is clear, as found by the District Court, that Richmond has dual school attendance areas; that the City is divided into areas for white schools and is again divided into areas for Negro schools; that in many instances the area for the white school and for the Negro school is the same and the areas overlap. Initial pupil enrollments are made pursuant to the dual attendance lines. Once enrolled, the pupils are routinely reassigned to the same school until granduation from that school. Upon granduation, the pupils are assigned in the manner found by the District Court to be as follows:
 
 
 9
 '* * * Assignments of students based on promotion from an elementary school to a junior high school and from a junior high school to high school are routinely made by the Pupil Placement Board. These assignments generally follow a pattern, aptly described as a system of 'feeder schools', that existed prior to 1954. Thus, a student from a white elementary school is routinely promoted to a white junior high school and in due course to a white high school. A Negro student is routinely promoted from a Negro elementary school to a Negro junior high school and finally a Negro high school. In order to change the normal course of assignment based on promotion all students must apply to the Pupil Placement Board. The majority of the plaintiffs in the present case are such applications.'
 
 
 10
 As of April 30, 1962, a rather serious problem of overcrowding existed in the Richmond Negro public schools. Of the 28 Negro schools 22 were overcrowded beyond normal capacity by 1775 pupils and the combined enrollments of 23 of the 26 white schools were 2445 less than the normal capacity of those schools. For the current 1962-63 school term, the applications for transfers from Negro to white schools of only 147 Negro pupils had been granted.
 
 
 11
 Four of the infant plaintiffs, who had completed elementary schools, sought admission to the white Chandler Junior High School. After comparing test scores of these pupils with test scores of other pupils, the Pupil Placement Board denied the applications on the ground of lack of academic qualifications. These plaintiffs contended that pupils from white elementary schools in the same attendance area are routinely placed in Chandler Junior High and their scholastic attainments or qualifications are not scrutinized by the Pupil Placement Board. The District Court concluded that academic criteria were applied to Negro pupils seeking transfer based on promotion, which criteria were not applied to the white pupils promoted from elementary schools to junior high schools. This, said the court, is discriminatory and is a vaid criticism of the procedure inherent in the system of 'feeder schools'. The court further stated:
 
 
 12
 'Proper scholastic tests may be used to determine the placement of students. But when the tests are applied only to Negroes seeking admission to particular schools and not to white students routinely assigned to the same schools, the use of the tests can not be sustained. Jones v. School Board of the City of Alexandria, 278 F.2d 72 (4th Cir. 1960).'
 
 
 13
 Another of the Negro plaintiffs, who was promoted from a Negro junior high school, sought admission to the 'white' John Marshall High School. His application had been denied because he lived thirteen blocks from the John Marshall High School and only five blocks from a Negro high school. However, it was pointed out in the court below that this plaintiff lives in the attendance area of the John Marshall High School and, had he been a white student, he would have been routinely assigned there without considering the didtance of his residence from that school or from another high school. The District Court said: '* * * Residence may be a proper basis for assignment of pupils, but it is an invalid criteria when linked to a system of 'feeder schools'. Dodson v. School Board of the City of Charlottesvill, 289 F.2d 439 (4th Cir. 1961).'
 
 
 14
 The remaining five plaintiffs sought transfers from the Graves Junior High School (Negro) to the 'white' Chandler Junior High School. They were denied transfer by the Pupil Placement Board because of lack of academic qualifications. The evidence showed that the same standards for determining transfers, upon application, from one junior high school to another junior high school were applied by the Board indiscriminately to both white and Negro pupils. The District Court stated:
 
 
 15
 '* * * Were this the only factor in this phase of the case, the issue would involve only judicial review of the decision of an administrative board. However, the situation of these plaintiffs must be considered in the context of the system of 'feeder schools', which routinely placed them in the Graves Junior High School while white students routinely were placed in Chandler Junior High School. The application of scholarship qualifications under these circumstances is discriminatory. Green v. School Board of the City of Roanoke (304) F.2d (118) (4th Cir., May 22, 1962).'[4]
 
 
 16
 With respect to a determination of the rights of all of the infant Negro plaintiffs, the District Court held:
 
 
 17
 'The foregoing facts and conclusions of law require the admission of the plaintiffs to the schools for which they made application.'An appropriate order was entered injoining and restraining the defendants from denying the infant plaintiffs, therein named, admission to the schools for which they ahd made application. The defendants have not appealed from this order.
 
 
 18
 It follows that each infant plaintiff has been granted the relief which he or she individually sought. But the District Court, although expressing its disapproval of the 'feeder school system' as now operating in the City of Richmond, denied further injunctive relief. The case was ordered retained on the docket for such further relief 'as may be appropriate'.[5]
 
 
 19
 The conclusion of the District Court that a 'reasonable start toward a non-discriminatory school system' had been made appears to have been based primarily upon consideration of four factors discussed in its opinion as follows:
 
 
 20
 'Rigid adherence to placement of students by attendance areas has been modified in four respects. First, the Chairman of the Pupil Placement Board testified that any Negro child applying for enrollment in the first grade of a white public school in his attendance area is assigned to that school. Second, the Superintendent of Schools testified that George Wythe High School and John Marshall High School had been constructed to accommodate all high school students in their respective attendance areas. Counsel stated in argument that six Negro students had applied for admission to George Wythe High School for 1962 and all had been accepted. Third, a Negro student presently attending a white school, upon promotion to a higher school, is routinely assigned to a white school. Fourth, some Negro students have been assigned to schools in white attendance areas.'
 
 
 21
 In the context of this case the principal questions to be determined may be stated as follows: (1) Are these four basic factors cited by the District Court sufficient to evidence a reasonable start toward maintaining a non-discriminatory school system and consistent with the true concept of equal constitutional protection of the races; and (2) should the court have granted further injunctive relief? We think question (1) must be answered in the negative and question (2) in the affirmative in view of the discriminatory attitude displayed by the Pupil Placement Board toward the transfers sought by the infant plaintiffs in the instant case and which transfers, denied as the result of discriminatory application of residential and academic criteria, were effected only through this protracted litigation.
 
 
 22
 It is notable that there is no assertion here, as in some of the other school cases, of a defense based upon a claim that a reasonable start has been made toward the elimination of racially discriminatory practices coupled with a suggestion that additional time, consistent with good faith compliance at the earliest practicable date, is necessary in the public interest. Instead, the answer of the City school authorities denied that anything done or omitted by them had given rise to the present litigation. The answer of the Pupil Placement Board admitted that the plaintiffs had complied with its administrative procedures but denied and demanded strict proof of facial discrimination.
 
 
 23
 One of the interrogatories served by the plaintiffs was: 'What obstacles, if any, are there which will prevent the racially non-discriminatory assignment of students to public schools in the City of Richmond at the commencement of the 1962-1963 school session?' The local school authorities side-stepped the question by claiming to be unable to answer because all power to assign students to schools had been vested by law in the Pupil Placement Board. That Board replied to the interrogatory as follows: '* * * That to the extent that such question implies discrimination, such implication is denied and that such question lacks sufficient specificity to evoke an intelligent snswer which does not involve broad conclusions or have argumentative dedeuctions. Aside from that, and under Brown v. Board of Education, these defendants know of no reason why students should not be assigned to public schools without discrimination on the ground of race, color, or creed.'
 
 
 24
 The Superintendent of Schools testified that the City School Board had not attempted to meet the problem of overcrowded schools by requesting that Negro pupils in overcrowded schools in a given area be assigned to schools with white pupils. He stated that some new schools and additions to existing schools had been provided. The record discloses that the earlier litigation, Warden v. The School Board of the City of Richmond, referred to in our footnote 3, was instituted on September 2, 1958. At a special meeting held on September 15, 1958 (approximately two weeks after the beginning of the school term), the School Board voted to request the Pupil Placement Board to transfer the pupils then attending the Nathaniel Bacon School (white) to the East End Junior High School (white), and that a sufficient number of pupils be tranferred from the George Mason (Negro) and Chimborazo (Negro) schools to the Nathaniel Bacon building to utilize its capacity, thus converting Nathaniel Bacon to a Negro school.
 
 
 25
 The attitude of the City school authorities, as disclosed by the Superintendent of Schools in his testimony, is and has been 'that the state law took out of the hands of the School Board and the Superintendent of Schools any decision relating to the integration of schools (and that) * * * it has been a feeling of both the School Board and the Administration.' that any conflict that might exist between the state and federal law should be decided by the Courts, not by the School Board and the Administration.'
 
 
 26
 The following is taken from the testimony of the Chairman of the Pupil Placement Board:
 
 
 27
 'Q. Well, what do you do where you have overlapping school zones and school areas?
 
 
 28
 'A. You have got that, of course, in Richmond.
 
 
 29
 'Q. Yes.
 
 
 30
 'A. Normally, I would say fully 99 per cent of the Negro parents who are entering a child in First Grade prefer to have that child in the Negro school. Judging by the small number of applications we get, that must be true. Now, we do not think that this Board was appointed for the purpose or that the law required the attempt on our part to try integrate every child possible. What we thought we were to do was to be completely fair in considering the requests of Negroes, we will say, to go into White schools, but certainly not trying to put those in that didn't want to go in.
 
 
 31
 'Now, when a Negro parent asks for admission of his child in the First Grade of a White school, very clearly he is asking for desegregation or for integration, or whatever you want to call it, and he gets it. And it is true that in general there will be two schools that that child could attend in his area, on White and one Negro, and we assume that the Negro wants to go to the Negro school unless he says otherwise, but if he says otherwise, he gets the other school.'
 
 
 32
 It is true that the authority for the enrollment and placement of pupils in the State of Virginia has been lodged in the Pupil Placement Board[6] unless a particular locality elects to assume sole responsibility for the assignment of its pupils.[7] The School Board of the City of Richmond has assumed no responsibility whatever in this connection. It does not even make recommendations to the Pupil Placement Board as to enrollments, assignments or transfers of pupils. It here defends charges against it of racial discrimination in the operation of the City's schools on the ground that the sole responsibility is that of the State Board. At the same time the system of dual attendance areas which has operated over the years to maintain public schools on a racially segregated basis has been permitted to continue. Though many of the Negro schools are overcrowded and white schools are not filled to normal capacity, the only effort to alleviate this condition has been to provide new buildings or additions to existing buildings, a move obviously designed to perpetuate what has always been a segregated school system.
 
 
 33
 It is clear that the pupil assignments are routinely made by the Pupil Placement Board. The Chairman of that Board says that now initial enrollments are on a voluntary basis and a Negro child may be enrolled in a white school upon request. But in the absence of a request, the long established procedure of enrollment of Negro children in Negro schools and white children in white schools persists. Then the 'feeder' system begins to operate and the only means of escape is by following the prescribed administrative procedure of filing requests or applications for transfer. The difficulties to be encountered in pursuing this course are graphically demonstrated by the experiences of the infant plaintiffs in this litigation. They were able to escape from the 'feeder' system only after the District Court made possible their release by ordering transfers.
 
 
 34
 A Negro child, having once been caught in the 'feeder' system and desiring a desegregated education, must esxtricate himself, if he can, by meeting the transfer criteria. As this court said in Green v. School Board of City of Roanoke, Virginia, 304 F.2d 118, 123 (4th Cir. 1962):
 
 
 35
 '* * * These are are hurdles to which a white child, living in the same area as the Negro and having the same scholastic aptitude, would not be subjected, for he would have been initially assigned to the school to which the Negro seeks admission.'
 
 
 36
 It was pointed out in Jones v. School Board of City of Alexandria, Virgainia, Board of City of Alexandria, Virginia, reason of the existing segregation pattern, it will be Negro children, primarily, who seek transfers. The truth of this statement is evidenced by the fact that in Richmond only 127 Negro children out of a total of more than 23,000 are now attending previously all-white schools. This court further said in Jones, supra: 'Obviously the maintenance of a dual system of attendance areas based on race offends the constitutional rights of the plaintiffs and others similarly situated * * *.' 278 F.2d 72, 76.
 
 
 37
 In recent months we have had occasion to consider the legality of other 'feeder' systems found in operation in the public schools of Roanoke County, Virginia, and in the City of Roanoke, Virginia. See Marsh v. County School Board of Roanoke County, Va., 305 F.2d 94 (4th Cir. 1962), and Green v. School Board of City of Roanoke, Virginia, 304 F.2d 118 (4th Cir. 1962). In those case, in opinions prepared by Chief Judge Sobeloff, the unconstitutional aspects of the systems there in operation were discussed in the light of the decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and in the light of numerous prior decisions of this and other courts. We find it unnecessary to again cite or review the pertinent decisions applicable to the maintenance of racially segregated school systems. In the Marsh and Green case we reached the conclusion that injunctive relief, not only for the individual plaintiffs but for those who might find themselves confronted with the same problems, was justified.
 
 
 38
 A start has, indeed, been made to end total segregation of the races in the Richmond schools. The first step has been taken, one which, no doubt, was distasteful to those who are traditionally and unalterably opposed to an integrated school system. But, upon this record and from the statements of the school officials, we find nothing to indicate a desire or intention to use the enrollment or assignment system as a vehicle to desegregate the schools or to effect a material departure from present practices, the discriminatory character of which required the District Court to order relief to the infant plaintiffs before it. In the present status in which the case was left by the District Court, the school authorities are yet free to ignore the rights of other applicants and thus to require the parents of new applicants to protest discriminatory denials of transfers, to require an infant applicant with his or her parents to attend a hearing on the protest which is not likely to be held earlier than August of 1963, and then to require the applicants to intervene in the pending litigation (possibly to be met with defensive tactics calculated to result in delay), the applicants fervently hoping to obtain relief from the court not long after the beginning of the 1963-64 school session if such relief is to be meaningful.
 
 
 39
 The School Board of the City of Richmond has abdicated in favor of the Pupil Placement Board leaving the latter with a school system which, in normal operation, has demonstrated its potential as an effective instrumentality for creating and maintaining racial segregation. Nearly nine years have elapsed since the decisions in the Brown v. Board of Education cases and since the Supreme Court held racial discrimination in the schools to be unconstitutional. The Richmond school authorities could not possibly have been unaware of the results of litigation involving the school systems of other cities in Virginia, notably Norfolk, Alexandria, Charlottesville and Roanoke. Despite the knowledge which these authorities must have had as to what was happening in other nearby communities, the dual attendance areas and 'feeder' system have undergone no material change.
 
 
 40
 Assignments on a racial basis are neither authorized nor contemplated by Virginia's Pupil Placement Act. We are told that initial assignments are now made on a purely voluntary basis but the Placement Board assumes that a Negro child prefers to attend a school with children of his own race and he is so assigned unless otherwise requested. Richmond's administration of her schools has been obviously compulsive and it is evident that there has been little, if any, freedom of choice.
 
 
 41
 'Though a voluntary separation of the races in schools is uncondemned by any provision of the Constitution, its legality is dependent upon the volition of each of the pupils. If a reasonable attempt to exercise a pupil's individual volition is thwarted by official coercion or compulsion, the orgainzation of the schools, to that extent, comes into plain conflict with the constitutional requirement. A voluntary system is no longer voluntary when it becomes compulsive.' See Jeffers v. Whitley, 309 F.2d 621, 627 (4th Cir. 1962).
 
 
 42
 Notwithstanding the fact that the Pupil Placement Board assigns pupils to the various Richmond schools without recommendation of the local officials, we do not believe that the City School Board can disavow all responsibility for the maintenance of the discriminatory system which has apparently undergone no basic change since its adoption. Assuredly it has the power to eliminate the dual attendance areas and the 'feeder' system which the District Court found to be primarily responsible for the discriminatory practices disclosed by the evidence. It would be foolish in the extreme to say that neither the City School Board nor the Pupil Placement Board has the duty to recognize and protect the constitutional rights of pupils in the Richmond schools. That there must be a responsibility devolving upon some agency for proper administration is unquestioned. We are of the opinion that it is primarily the duty of the School Board to eliminate the offending system.[8]
 
 
 43
 In these circumstances, not only are the individual infant plaintiffs entitled to relief which has been ordered but the plaintiffs are entitled, on behalf of others of the class they represent and who are similarly situated, to an injunction against the continuation of the discriminatory system and paactices which have been found to exist. As we clearly stated in Jeffers v. Whitley, 309 F.2d 621, 629 (4th Cir. 1962), the appellants are not entitled to an order requiring the defendants to effect a general intermixture of the races in the schools but they are entitled to an order enjoining the defendants from refusing admission to any school of any pupil because of the pupil's race. The order should prohibit the defendant's conditioning the grant of a requested transfer upon the applicant's submission to futile, burdensome or discriminatory administrative procedures. If there is to be an absolute abandonment of the dual attendance area and 'feeder' system, if initial assignments are to be on a nondiscriminatory and voluntary basis, and if there is to be a right of free choice at reasonable intervals thereafter, consistent with proper administrative procedures as may be determined by the defendants with the approval of District Court, the pupils, their parents and the public generally should be so informed.
 
 
 44
 If, upon remand, the defendants desire to submit to the District Court a more definite plan, providing for immediate steps looking to the termination of the discriminatory system and practices 'with all deliberate speed,' they should not only be permitted but encouraged to do so.
 
 
 45
 The District Court should retain jurisdiction of this case for further proceedings and the entry of such further orders as are not inconsistent with this opinion.
 
 
 46
 Reversed in part and remanded.
 
 
 47
 ALBERT V. BRYAN, Circuit Judge (dissenting in part).
 
 
 48
 I see no need for the prospective injunction. With fairness and clarity the opinion of the Court comprehensively discusses and approves the course the District Court prescribed for the defendants to follow in the future. With no reason to believe his directions will not be respected, the District Judge refused the injunction. In this he exercised the discretion generally accorded the trial judge in such situations, especially when the necessity for an injunction must be measured by local conditions. Of these we have no knowledge more intimate than his. I would not add the injunction.
 
 
 
 [1]
 Of eleven original pupil plaintiffs, one was assigned by the Pupil Placement Board to an integrated Junior High School to which he had made application before the hearing in the District Court. His case became moot
 
 
 [2]
 Raised below (but not involved in this appeal) was the issue as to the joinder of the Richmond School Board and Superintendent of Schools as parties defendant. Correctly, we think, the District Court held:
 '* * * The State Pupil Placement Board has authority over the placement of pupils, and the local officials refrain from making recommendations to the Board, but approximately 98 per cent of the placements are made routinely as a result of the regulations of the School Board pertaining to attendance areas. The evidence shows that the State Pupil Placement Board has no inclination to vary these attendance areas, although undoubtedly it has authority to do so. In view of this situation, the School Board and the Superintendent of Schools are proper parties.'
 
 
 [3]
 On September 2, 1958, a suit styled Lorna Renee Warden et al. v. The School Board of the City of Richmond, Virginia, et al. was instituted in the District Court, praying, inter alia, that a permanent injunction be entered restraining the Richmond School Board and its division Superintendent of Schools from any and all actions that regulate or affect, on the basis of race or color, the admission, enrollment or education of the infant plaintiffs, or any other Negro child similarly situated, to and in any public school operated by the defendants
 That suit was decided on July 5, 1961. The District Court ordered that the then one remaining Negro plaintiff be transferred from the Negro school located five miles from her home and admitted to the white school in her neighborhood. However, the court denied class relief, stating: 'There is no question as to the right of the infant plaintiff to be admitted to the schools of the City of Richmond without discrimination on the ground of race. She is admitted, however, as an individual, not as a class or group; and it is as an individual that her rights under the Constitution are asserted.'
 The court refused to grant a permanent injunction and dismissed the case from the docket.
 
 
 [4]
 The case to which the District Court referred is styled Green v. School Board of City of Roanoke, Virginia, and is now reported in 304 F.2d 118
 
 
 [5]
 In its written opinion the District Court stated as follows:
 'The plaintiffs prayed that the defendants be enjoined from continuing discrimination in the city schools and that the School Board be required to submit a desegregation plan. The Court has weighed all of the factors presented by the evidence in this case and finds that the defendants have taken measures to eliminate racially discriminatory enrollments in the first grade. Apparently they are eliminating discriminatory enrollments in George Wythe High School (white) and they are routinely assigning Negro students in white junior high schools to white high schools.
 'While the School Board has not presented a formal plan of desegregation, the Court finds that the defendants have made a reasonable start toward a nondiscriminatory school system resulting in the attendance of 127 Negro students in white schools for the 1962-1963 school term. In view of the steps that have been taken in this direction, the Court concludes that the defendants should be allowed discretion to fashion within a reasonable time the changes necessary to eliminate the remaining objectionable features of the system of 'feeder schools'.
 'In Brown v. Board of Education, 349 U.S. 294, 300 (75 S.Ct. 753, 99 L.Ed. 1083) (1955), the Supreme Court stated 'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a faility for adjusting and reconciling public and private needs.' The Court is of the opinion that the relief decreed in this case is sufficient at this time in view of the evidence presented. The refusal of broad injunctive relief now is not to be construed as approval to continue the 'feeder school system' as it is now operated. See Hill v. School Board of the City of Norfolk, Virginia, 282 F.2d 473 (4th Cir. 1960); Dodson v. School Board of the City of Charlottesville, 289 F.2d 439 (4th Cir. 1961).
 'This case will be retained on the docket for such further relief as may be appropriate.'
 
 
 [6]
 Va.Code Ann. 22-- 232.1-232.17 (Supp. 1960)
 
 
 [7]
 Va.Code Ann. 22-- 232.18-232.31 (Supp. 1960)
 
 
 [8]
 Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958)