**Vivian CALHOUN et al.**

v.

**A. C. LATIMER et al.**

**Civ. A. No. 6298.**

United States District Court
N. D. Georgia,
Atlanta Division.

Sept. 8, 1960.

E. E. Moore, Jr., Atlanta, Ga., Constance Baker Motley, Thurgood Marshall, New York City, for plaintiff.

J. C. Savage, Newell Edenfield, B. D. Murphy, Atlanta, Ga., for defendant.

HOOPER, Chief Judge.

On February 26, 1960 plaintiffs filed a notice, seeking to require defendants to put into operation the Plan heretofore approved by this Court under which the public schools of the City of Atlanta might operate without discrimination. Plaintiffs pray that the Plan become effective in September, 1960. This Court on May 9, 1960 denied such prayers, but decreed that the Plan should be effective in September, 1961.

At the time of hearing the aforesaid motion the Court made a full explanation of the reasons for the year's delay, stating that such remarks would be edited and filed of record subsequently. This Opinion performs that function.

History of this Litigation.

(1) When this action was filed the people of Georgia did not seem to consider that it created any immediate threat to Georgia's common schools. The Judges of this Court in the fall of 1958 passed an Order advising the case would be tried before September, 1959. Not until that time did the people begin to realize that something must be done. Meetings were held and various organizations formed to meet the problem.

In June, 1959 this Court declared that segregation existed, that it must be terminated, and that the defendant Board of Education should file a Plan toward that end by December, 1959, which was done. After various objections were con-

sidered the Plan was approved in its final form on January 18, 1960.

The Court at that time declined to order the Plan effective in September, 1960, reserving such ruling until a Commission, appointed by the Georgia Legislature, in January, 1960, should have an opportunity to make its report, the report being due May 1, 1960. The report was filed on that date and pursuant to previous Order of this Court a hearing was held May 9, 1960. At that time the Plan was ordered to commence in September, 1961, for reasons hereinafter set forth.

(2) Throughout this litigation the Court has held to the opinion that delay in ordering the entire elimination of segregation in the Atlanta Public Schools could be justified only in the event that bona fide efforts were being made to eliminate the same under a reasonable and gradual Plan. If no good faith efforts were to be made to that end, nothing could be accomplished by delay.

The Georgia Legislature in January, 1960 did not enact legislation which would allow the Atlanta Public Schools to commence operation under the aforesaid Plan, but left the matter in such status that, under the Georgia laws as they existed, the operation of such Plan in September, 1960 would have meant the closing of the Atlanta Public Schools, with the possible further consequence that all of Georgia's common schools must be closed.

The Legislature at that session, however, did appoint a committee of outstanding Georgians to study the matter and report back May 1, 1960. Some might have thought that the failure of the Legislature in January, 1960 to pass laws permitting operation of the Atlanta Plan should have induced the Court to order the Plan into effect anyway in September, 1960. The Court, however, did not agree. In the first place, such Order of Court could have no effect except to close the Atlanta schools and risk the danger of all of Georgia's schools being closed. In the second place, the Georgia Legislature in January, 1960 had

for the most part been elected upon their promises to the people that they would not under any circumstances permit any integration in any school in Georgia, and they felt bound by these promises.

(3) Some may think that the appointment of the Study Commission by the Legislature had no other purpose than to obtain a year's delay. As to that this Court cannot say. However, the Court thinks the appointment of the Commission was a wise step and that much progress has resulted therefrom. Hearings were held in every Congressional District in Georgia, many witnesses were heard, and the purposes of the study and the situation faced by Georgia, were carefully explained to the people of Georgia by the able chairman of the Commission, Honorable John A. Sibley, an outstanding attorney and banker of this state. It was reported that numerically three out of five of the witnesses favored maintaining segregation, even though it might result in abolishing the Georgia public school system. That fact alone, however, shows a decided shift in public opinion in Georgia. This Court is confident that, except for the education of the people by such Commission, the vote would have been overwhelmingly against any integration, whatever the consequences.

This Court on May 9, 1960, therefore, had the feeling that the best interests of Georgia would be served by permitting a new legislature to be elected, with full knowledge by most of our people as to the real issues involved, and the possible disastrous consequences which could flow from the failure of the Georgia Legislature to permit the Atlanta Plan to become effective.

(4) It now seems clear that the people of Atlanta and Fulton County would prefer to have said Plan put into operation, than to have Atlanta's schools closed. It is quite evident that many other populous centers in Georgia have the same feeling. This feeling is not shared by citizens living in the rural areas for two reasons. First, they do not have the residential patterns that exist in the cities, which patterns as formerly pointed out by this

Court, would result in the schools located in the white areas being practically all white and those located in Negro areas to consist almost altogether, if not totally, of Negroes. Such a situation, coupled with a Pupil Assignment Plan on application of the students, would cause little mixing. The residential patterns in the country, however, would not give this advantage. Second, the people in our rural areas have the feeling that if any integration is permitted in Atlanta, or other city in Georgia, it will be but a beginning which will in time spread to their areas.

The danger which Georgia faces in the event that representatives of the rural communities will not permit the Atlanta Plan to become operative, is clearly and forcefully brought out by the report of the Legislative Committee, sometimes called the Sibley Committee in honor of its distinguished chairman. The report pointed out that under a similar situation in Virginia a three-judge court ruled that "no one public school or grade in Virginia may be closed to avoid the effect of the law of the land as interpreted by the Supreme Court, while the state permits other public schools or grades to remain open at the expense of the taxpayers." See James v. Almond, D.C., 170 F.Supp. 331, 337.[1]

(5) This Legislative Committee recommended five specific statutes or resolutions to be passed by the General Assembly in 1961. Recommendation No. 1 and Recommendation No. 2 pertain to constitutional amendments, which if proposed to the people in January, 1961 cannot be voted upon until the general election in November, 1962, after the schools have commenced in September.

Recommendation No. 5, however, reads as follows:

"That the General Assembly consider whether, in view of the urgency created by the Atlanta case and other cases which may be brought, it will propose to close the public schools in order to maintain total segregation throughout the state or whether it will choose a course designed to keep the schools open with as much freedom of choice to each parent and community as possible; and, if it chooses the latter course, that it enact legislation enabling each school board or other local body to establish a pupil assignment plan; empowering the people of each community to vote whether to close their schools in the event of integration or to continue the operation of said schools; and enabling each parent to withdraw his child from an integrated school and have the child reassigned to a segregated school or receive a tuition grant or scholarship for private education."

That portion of Recommendation No. 5 suggesting legislation permitting the people of each community to elect as to whether they adopt a Pupil Assignment Plan, or whether they close their schools, is worthy of careful study. That is to say, should the Legislature permit Atlanta to put into effect in September, 1961 the proposed Plan, the State of Georgia would free itself of the danger which it faces, to-wit, that the closing of the Atlanta schools in September, 1961 would, under application of the principles of law in the Virginia case set forth above, result in the closing of all the public schools in Georgia.

(6) The majority vote of the Legislative Committee makes it clear that the majority of the Committee are opposed to any integration, but they hold the conviction that, since integration is inevitable, it is better to allow each community of the state to decide for itself whether to risk the closing of its schools.

---

[1]. On August 27, 1960 a three-judge Federal Court in New Orleans, in the case of Bush v. Orleans Parish School Board et al., D.C., 187 F.Supp. 42 declared invalid a Louisiana statute which gave the Governor the right to close any school in the state ordered to integrate. The Court also enjoined the Treasurer of the State and all persons acting in concert with him from enforcing any Louisiana statute which would deny school funds of any kind to any public school in the State of Louisiana because such school has been desegregated.

The majority report is made by men having the best interests of Georgia's common school system at heart, and includes the Chancellor of the University System and the Superintendent of Schools of Georgia. It also includes the Chairman of the Board of Regents of Georgia, and other outstanding Georgians.

(7) This Court wishes to make it clear that the Court has no desire to meddle into the affairs of the Georgia Legislature or the State of Georgia, but is making a sincere effort to enable the people of Georgia and its legislature to make a decision in this matter, if they so desire, that will prevent the closing of the schools of Georgia. This is a matter of grave concern to the people of Georgia and in particular, to the parents having children of school age but not having sufficient funds with which to provide a private school for their children.