Vivian CALHOUN et al., Infants, by Fred Calhoun, their father and next friend, et al., Appellants,

v.

A. C. LATIMER et al., Appellees.

No. 20273.

United States Court of Appeals Fifth Circuit.

June 17, 1963.

Rehearing Denied Aug. 16, 1963.

Constance Baker Motley, New York City, E. E. Moore, Jr., Donald L. Hollowell, Atlanta, Ga., Jack Greenberg, New York City, for appellants; Norman Amaker, New York City, A. T. Walden, Atlanta, Ga., of counsel.

A. C. Latimer, J. C. Savage, Newell Edenfield, Atlanta, Ga., for appellees.

Before RIVES, LEWIS * and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

## I.

This appeal from an order denying a motion for further relief brings up for review, for the first time;[1] the plan for the desegregation of the Atlanta school system. The plan was formulated pursuant to court order, and approved by the court on January 20, 1960. It became effective on May 1, 1961 for the school term 1961–62 beginning in September 1961. It was applied to the twelfth and eleventh grades at that time for the purposes of desegregation, to the tenth grade beginning with the 1962–63 school term, and will be applied to the ninth grade beginning with the 1963–64 school term. It is to be applied progressively to the next succeeding grade each school term thereafter until all grades in the school system have been included, and desegregated.

The sequence of events in this case began with the filing of a complaint on January 11, 1958 by appellants seeking the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution; Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, having proscribed racial discrimination in public education. The District Court had first enjoined appellees, members of the Board of Education of the City of Atlanta, and the school superintendent, from enforcing and pursing the policy, practice, custom, and usage of requiring or permitting racial segregation in the operation of the schools, and from engaging in any and all action which limited or affected admission to, attendance in, or the education of the appellant children, or any other Negro children similarly situated, in the schools on the basis of race. A reasonable period of time was allowed within which to comply with the order, and for bringing about a transition to a school system not operated on the basis of race. The school board was required to present a plan on or before December 1, 1959 designed to bring about compliance with the order, and which would provide for a prompt and reasonable

* Of the Tenth Circuit, sitting by designation.

1. Appellants filed notice of appeal from the order of the court dated March 9, 1960 refusing to make the plan effective for the school term 1960–61 but dismissed the appeal.

start toward desegregation of the public schools of Atlanta, and a systematic and effective method for achieving such desegregation with all deliberate speed.

A plan was submitted, contingent upon the enactment of statutes by the State of Georgia permitting the same to be put into operation. It provided procedures of uniform application for the assignment, transfer, or continuance of pupils among and within the schools of the system. The plan was largely modeled upon the placement law approved as constitutional on its face in Shuttlesworth v. Birmingham Board of Education, N.D.Ala., 1958, 162 F.Supp. 372, affirmed, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145. It was, however, amended in various respects by court order before final approval to meet some of the objections of appellants. There was also objection to the plan being contingent upon changes in the state laws which then required segregated schools, under penalty, among others, of loss of state financial support. The court limited the contingency to one year and included two grades in the plan for the first year of its operation. It was to be invoked for the 1961–62 school year in any event. See Calhoun v. Members of Board of Education of City of Atlanta, N.D.Ga., 1959, 188 F.Supp. 401; D.C., 188 F.Supp. 412.

## II.

The Georgia laws were changed, obviating harm to public education, and making it possible for the plan of the school board to proceed on schedule. Schools were no longer classified as white or Negro, but the plan did contemplate that each child would continue in the school to which assigned for the then present school term unless and until transferred, on request, to another school. Applications for transfer were to be filed between May 1 and May 15 in each school year. This was the method of transition agreed upon rather than some other plan requiring reassignment by school officials. Any child was free to seek transfer to the grades within the plan.

Some three hundred Negro children and one white child obtained application forms for transfer for the 1961–62 term. Only one hundred and thirty of these were actually filed by Negro children. Ten of these were granted and reassignment was made to the eleventh and twelfth grades of formerly white schools. The transfer sought by the white child out of one of these schools because Negroes were to be admitted was denied. See Stone v. Members of Board of Education of City of Atlanta, 5 Cir., 1962, 309 F.2d 638. At this time there were one hundred thirteen elementary schools, grades one through seven, and twenty two high schools, grades eight through twelve, in Atlanta. There were no junior high schools. Forty one of the elementary schools were all Negro in attendance while seventy two were all white. This is still true since the plan has not reached the elementary grades. There were five all Negro and seventeen all white high schools. This latter number was reduced to thirteen by the transfer of the ten Negro students. Forty four additional Negro students, out of some two hundred sixty six requesting transfer, were transferred to white schools for the 1962–63 term resulting in the desegregation of seven additional formerly all white schools. The result to date is that there are eleven integrated high schools in Atlanta, five all Negro high schools and six all white high schools.

Special intelligence tests were given those students seeking transfer under the plan in 1961, but this requirement was abandoned prior to 1962; thus, our discussion will center on the practices and procedures required under the plan for 1962. Only a few of the seventeen factors or criteria set out in the plan were used. A scholastic ability and achievement test routinely given to every child in the grades in question in the school system was used in considering the applications. The standard used was that the transferee had to score a grade at least equal to the average of the class in the school to which transfer was requested. Such a requirement is, of

course, discriminatory per se when applied only to Negro students. Proximity of the residence of the student to the school in question, subject to variation for educational reasons, and also the reasons given on the application for the requested transfer were other factors used. Each student was also given a personality interview by school officials to determine probable success or failure in the new school.[2]

When the plan became effective, all students in the grades to be segregated were already assigned to high schools. Thus, the plan to date encompasses only those students wishing to transfer, and new students entering a school for the first time in the desegregated grades. However, it has not been applied to new students, nor to those students being transferred at times other than during the period May 1 to May 15 under the plan. Transfers, other than during this period, not substantial in number, are known to the school board as informal transfers, and are to be distinguished from transfers under the plan, called formal transfers.

There is no evidence that the criteria applied in informal transfers were racially discriminatory as among informal transferees, but they were apparently different from the criteria applied in formal transfers. The school superintendent testified that the criteria applied in formal transfers included the reason given by the student for requesting transfer, tests that were a part of his permanent record, grades, teacher opinion and educational judgment as to whether the request, for these reasons, would be educationally justified. Also considered was proximity of residence to school and the capacity of the school. The difference in the requirements for formal and informal transfers, in the main, was that no personality interview was required for informal transfers, nor

does it appear that the standard of scholastic ability basis was the same.

The form used in requesting transfers as well as the plan itself is designed to apply in the admission and assignment procedure, as well as in the transfer procedure. The District Court said in this regard:

"Essentially the Plan contemplates that all pupils in the schools shall, until and unless transferred to some other school, remain where they are, all new and beginning students being assigned by the Superintendent or his authority to a school selected by observance of certain standards as set forth in the proposed Plan." 188 F.Supp. 401, 406, supra.

Not one of the Negro applicants for transfer has complained individually to the District Court at any time. The case is still proceeding as a class action. Both appellants and the school board were satisfied to rely largely on the testimony of the school superintendent. His testimony in substance was that the board was abiding the letter and the spirit of the plan approved by the court. Pupils were assigned to schools they attended the previous year in order to establish a base from which they were free under the plan to request a transfer. He contended that the Atlanta school system was desegregated, and pointed out that all mention of race had been removed from the school directory, official reports, building programs, and all other classifications. Schools are no longer designated as white or Negro. Negro students assigned to previously all white schools participated in both regular and extra-curricular activities, including honor banquets, clubs and other activities on the basis of free choice, and their parents attended Parent-Teacher Association meetings, athletic events, graduation programs and other school activities

2. Such solicitude has rightly been condemned where applied only to Negroes, Green v. School Board of City of Roanoke, Virginia, 4 Cir., 1962, 304 F.2d 118, although it would appear, where done in

good faith, and there is no contrary contention here, to lend itself, at least in the early days of transition, to assuring the success of a plan.

free of racial discrimination. School events to which the public is invited are not segregated, nor are meetings of professional committees.

 He testified that there were no attendance areas or zone lines established by the board, but that lines are sometimes drawn administratively between schools in an attempt to equalize class loads. There was no evidence before the court that they were based on race. The Atlanta system is divided into five sub-areas with an assistant superintendent in charge of each area. One sub-area has only all Negro schools in it, but there is no evidence of white children living in it, or that it resulted from gerrymandering.[3]

Another pertinent fact is that there is overcrowding in the school system particularly in those schools still having all Negro populations, with additional schools being needed. Some white schools are under populated. The growth in the school population in recent years is almost entirely Negro, with considerable change in area patterns from the standpoint of changing from white to Negro residents.

The District Court in this case, after hearing all evidence offered, and full arguments, held:

"There is no disputing that discrimination had existed prior to the Order of this Court of January 20, 1960, and that the Order of that date was designed to eliminate the discrimination over a period of years. Even plaintiffs' counsel upon the original trial disclaimed any purpose of seeking to have 'wholesale integration.' The only question then involved was the plan by which discrimination could be eliminated; a Plan was carefully prepared and adopted and no appeal taken. The Plan is eliminating segregation, but until it has completed its course

there will of course still be areas (in the lower grades) where segregation exists. The Court is therefore at a loss to see how anything could be accomplished at this time by 'an order enjoining defendants from continuing to maintain and operate a segregated, biracial school system,' for the Court has already taken care of that in its decree of January 20, 1960. There is no evidence that defendants are 'continuing to designate schools as Negro or white,' nor that they are maintaining 'racially segregated extra-curricular school activities.'

"The assigning of teachers and other personnel on the basis of race and color is not now passed upon but is deferred (as other courts have done) awaiting further progress made in the desegregation of the students.

\* \* \* \* \* \*

"Neither does the evidence show that defendants are maintaining a 'dual system of school attendance area lines.' Proximity to the schools in question is a factor considered by the defendant Board. It is not shown that defendants are acting arbitrarily in connection with the assignment of pupils in relation to their distance from the school. It does appear that area lines (where such exist) are sometimes changed for the sole purpose of relieving overcrowded conditions in the schools.

\* \* \* \* \* \*

" \* \* \* The Plan heretofore approved by this Court, and now under attack, has been administered fairly and in good faith by defendant Atlanta Board of Education, the local authorities have given utmost cooperation in maintaining law and order, and the number of students

---

3. The dearth of evidence probably results from the parties each taking the position that the burden of proof was on the other. The burden is plainly on the board to justify the plan and the delay under it.

Having done so and having obtained the approval of the court, we think that the burden shifted to appellants to at least make a prima facie showing that changes were in order.

being transferred * * * from previously designated colored schools to previously designated white schools is increasing at an accelerated rate each year as the lower grades are reached. This Court feels that the public interests demand that the Plan now in operation be continued according to its terms and not be summarily displaced by the new Plan of Desegregation proposed by plaintiffs." Calhoun v. Latimer, N.D.Ga., 1962, 217 F.Supp. 614.

## III.

■■■ The questions presented may be reduced to four in number. First, can the Atlanta plan be justified in the light of the results of its operation to date, and in view of the teachings of Brown, supra, the second Brown case, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, Cooper, infra, and the most recent decisions of this court, handed down long after the Atlanta plan became effective. Bush v. Orleans Parish School Board, 5 Cir., 1962, 308 F.2d 491; and Augustus v. Board of Public Instruction of Escambia County, Florida, 5 Cir., 1962, 306 F. 2d 862. Second, assuming that it may, has it been applied in a discriminatory manner? This includes the questions of admission, assignment, transfers, both formal and informal, and extra-curricular activities. Third, was it error for the District Court to postpone consideration of the practice relating to the assignment of teachers? Fourth, did the court err in not speeding up the plan as suggested by appellants?

And with these facts before us, we begin the consideration of the questions presented with the mandate of the Supreme Court in the second Brown opinion in mind. There the court, with regard to eliminating racial discrimination in public education following its decision in the first Brown case, supra, said:

"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal. * * *

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.

"While giving weight to these public and private considerations, the courts will require that the defendants make·a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in·

the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases."

And see Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, where, after reiterating what was said in the Brown implementation decision, and the investiture of supervisory powers in the District Courts for the necessary transition from segregated to desegregated school systems, the court said:

"Under such circumstances, the District Courts were directed to require 'a prompt and reasonable start toward full compliance,' and to take such action as was necessary to bring about the end of racial segregation in the public schools 'with all deliberate speed.' * * * Of course, in many locations, obedience to the duty of desegregation would require the immediate general admission of Negro children, otherwise qualified as students for their appropriate classes, at particular schools. On the other hand, a District Court, after analysis of the relevant factors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present nonsegregated admission of all qualified Negro children. In such circumstances, however, the courts should scrutinize the program of the school authorities to make sure that they had developed arrangements pointed toward the earliest practicable completion of desegregation, and had taken appropriate steps to put their program into effective operation. * * * *"

Nothing then could stay the inexorable hand of the Constitution in this regard. Some school boards complied without the intervention of the courts. Others acted under court order, as did the Atlanta board. The cases arising are myriad, but each, with respect to transition, goes back to the fountainhead, Brown and Cooper. Does the plan as conceived and administered comport with the constitutional mandate and the duty imposed on school boards and District Courts? Gradualism in desegregation, if not the usual, is at least an accepted mode with the emphasis on getting the job of transition done.

IV.

The questions here may be the better discerned in the background of what appellants offered by way of a plan in the District Court. The plan proposed by them in connection with the motion for further relief which is the subject matter of this appeal suggested a speed up of five years in the original twelve year plan for transition. Their suggestion was that grades eight and nine rather than nine be desegregated in September 1963. They would desegregate grades four, five, six and seven in September 1964, and grades one, two and three in September 1965. They would reassign all high school teachers, counselors, principals and supervisors prior to the opening of school in September 1963 on the basis of qualification and need without regard to race or color. The same procedure would be followed as to such personnel on the succeeding years in connection with the proposed desegregation procedure. All school sponsored, school related, school supported, school sanctioned extra-curricular school activities would be open to all qualified students

without regard to race or color as each grade is desegregated. Desegregation would be provided on the basis of drawing school zone lines for each school and assigning all children living in the zone to the school without regard to race or color. It is this last suggestion that is the bare bones of this case and which gives rise to the first question.

Appellants do not object to a gradual plan. They do seek to speed it up from a twelve to a seven year span for accomplishment. What they object to is that feature of the court approved plan that permits the continued assignment of those children already in school to the same schools with the right to transfer. This question has not heretofore been before this court. We held in Bush v. Orleans Parish School Board, supra, and in Augustus v. Board of Public Instruction of Escambia County, Florida, supra, that dual school districts must be abolished as they related to the grades being desegregated. We have never laid out a method of abolishment, or adopted a policy of absolutism. The Atlanta plan of abolishment is one of gradualism by permitting transfers from present assignments. The New Orleans plan in Bush, formulated by the District Court instead of the school board, begins with the first grade. It recognizes the dual system and provides for its elimination by permitting the children, at their option, to attend either the formerly all white or all Negro school nearest their homes, with transfers to be allowed provided they are not based on consideration of race. The Houston plan which was also court formulated, Ross v. Dyer, 5 Cir., 1962, 312 F.2d 191, is substantially like that of New Orleans. We do not yet know what method of eliminating the dual system is to be used in the Escambia County case. Even if it may be said that there is a dual system in Atlanta, and the evidence does not so disclose,[4] it can also be said that there is an option under the Atlanta plan just as there is under the New Orleans and Houston plans, assuming the plan is applied to transfers as well as assignments of all new students in desegregated grades, and is not based on consideration of race.

This court disapproved one feature, in the nature of an option, of a plan for desegregating the Dallas school system which afforded a modicum of freedom of choice by permitting transfers on the basis of race. Boson v. Rippy, 5 Cir., 1960, 285 F.2d 43. The Supreme Court has now affirmed this position in holding invalid similar features in plans of the Nashville and Knoxville school systems. Goss v. Board of Education of City of Knoxville, Tenn., 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632. But, as this court was at pains to say in Boson v. Rippy, a school board has ample authority to transfer pupils from school to school upon any reasonable and legitimate basis without regard to race or color. The New Orleans and Houston plans contain provisions in point. The Charlottesville, Virginia plan also demonstrates this teaching. Once assignments have been made there on the basis of residence, transfers are permitted upon request of parents or students, and school officials are to take into account residence, academic qualifications, personal desires, need for particular courses, school enrollment, available teaching personnel and physical facilities, and "other lawful and objective considerations", but the court made it clear upon review of the plan that race cannot be a consideration. Dodson v. School Board of City of Charlottesville, 4 Cir., 1961, 289 F.2d 439.

The Bush and Escambia County cases forbid dual school districts. They authorize the option system. Boson v. Rippy permits transfers out of single or integrated districts if not based on race. The Atlanta plan when considered in its over-all scope falls within the ambit of these bench marks, if properly and fairly administered. We understand its scope, and it must be so applied, to include ap-

---

4. The dual system undoubtedly continues in the grades not yet reached by the plan. It exists in residual form in the grades reached because desegregation has not reached the elementary school grades which feed the high schools.

plication to the assignment of any student new to a school for admission in a desegregated grade. It is to be applied to all transfers, be they formal, informal or otherwise.

The main thrust or force of its application will be in the admission and assignment from elementary to high schools, and to the first grade. This means that for the school term beginning in September 1964, the plan will lay hold of the feeder system for the first time. This follows from the fact that such factors as are used for assignment and transfer must be used system wide in the assignment and transfer of seventh grade students to the eighth grade since they will be moving from one school to another, elementary to high school. This will remove even the residuum of the dual system from this grade, and will rapidly dissipate it from the other high school grades as other succeeding elementary grades reach the eighth grade. The dual system will be entirely eliminated when the plan reaches the first grade.

The unique Atlanta plan of desegregation from the top down operates in fits and starts when compared with what has become the almost universal plan of starting in the first grade and working up. Nevertheless, it is the one approved and used to date, and it appears that the end mandatory result of a desegregated system will be accomplished under it. And while the progress to date is not looked on with favor by appellants, it may be noted that other results are being attained that are not present in those systems following plans beginning with the first grade. These have to do with the desegregated extra-curricular activities that exist in high schools, but not in elementary schools, such as honor societies, athletics, clubs, graduation activities and the like. The importance of these results cannot be gainsaid.

The decision reached in this case is in the light of the fact that there is no evidence that the Atlanta School Board has acted other than in the utmost good faith throughout this litigation. There is no evidence that the District Judge has proceeded except in the highest tradition of the federal courts, and in a persistent and wise manner to accord appellants their constitutional rights while at the same time preserving the educational process in the transition period.

Our decision must also be rendered upon a consideration of the most recent pronouncements of the Supreme Court, Goss v. Board of Education of City of Knoxville, Tenn., supra, and Watson v. City of Memphis, 373 U.S. 526, 83 S. Ct. 1314, 10 L.Ed.2d 529, which make it plain that the time available for the transition from segregated to desegregated school systems is, with the passage of years since the Brown decisions, becoming more sharply limited. Indeed, we so stated in an opinion theretofore rendered on May 24, 1963. Davis v. Board of School Commissioners of Mobile County, 5 Cir., 318 F.2d 63. But, on the same day, where a District Court had refused a temporary injunction in a school case, the same panel ordered an immediate start on a one grade per year basis. Stell v. Savannah-Chatham County Board of Education, 5 Cir., 318 F.2d 425, (opinion by C. J. Tuttle, concurring, JJ. Rives and Bell). This is said to point up that each case stands to a large extent on its own. There is no circuit-wide formula or minimum by which to measure steps forward or backward, and no decision has so suggested. Good faith and substantial progress are the indispensable ingredients.

So considered, we hold that there is insufficient evidence on which to base a determination that the start made in the Atlanta schools is not reasonable, or that the plan is not proceeding toward the goal at deliberate speed. The court did not err in denying the speed up. It was a discretionary matter, and there is no showing of an abuse of discretion, in law or in fact.

Nor did the court err in failing to substitute the absolute zone plan as suggested for the present plan to accomplish acceleration. There was no evidence before the District Court from which an approximation might be made of the

amount of desegregation reasonably to be expected under such a zone plan, or under an option plan with a transfer provision such as is being used in New Orleans and Houston, or under a zone plan with a transfer provision such as is being used in Charlottesville. In short, there was nothing to show the inadequacy of the present system in comparison.

It is clear that no student has complained to the court concerning discriminatory treatment by those in charge of the schools, either in being afforded transfer rights, or in the administration or application of those rights. Counsel for the school board recognized in argument the possible discriminatory application of the plan with respect to differences in requirements for formal and informal transfers. No ruling was made in the court below on this or the fact that the plan is not being used for the initial assignment of students new to a school and to grades that have been desegregated. They were there considered, if at all, as incidental to the main question of continuing present assignments. They were never called to the attention of the school board.

### V.

We affirm the order of the District Court within the context of what we have had to say regarding the plan, and having in mind that the jurisdiction of the District Court will continue. Such deficiencies as we have pointed to, or other matters involving discrimination which may arise may be considered by the District Court in the event they are not adjusted by those having charge of the schools. See Ross v. Dyer, supra, where the brother-sister rule was voided. This is in line with the procedure followed in Dodson v. School Board of City of Charlottesville, supra, where a plan already in operation was recently examined by the Court of Appeals for the Fourth Circuit and found deficient in some respects. The decision was affirmed with a proper caveat to the deficiencies. It was there said:

"The action we take is based on the particular history and circum-

stances associated with this case. In appeals involving school desegregation problems, where the Supreme Court has permitted a period of transition for the desegregation of schools, each case is to some extent dependent on its own particular facts. The attitude of particular school authorities, their past conduct, the progress they have been making, the varying administrative difficulties that may be shown to exist in different localities, the court's view as to the officials' future intentions, and other factors must be taken into consideration."

The plan of the District Court here is for the transition period. Time will tell whether other questions regarding discrimination in the areas of extra-curricular activities, or leading from the assignment of teacher personnel are rendered moot. There is no evidence to support the charge of discrimination in extra-curricular activities in the grades that have been desegregated in Atlanta, and the District Court did not err in postponing the consideration of teacher assignment question. Augustus v. Board of Public Instruction of Escambia County, Florida, supra.

In the meantime the Atlanta plan is working. Progress is the test, and the necessary transition is taking place. There has been no trouble. All responsible officials and many private citizens have cooperated to make it work, and to preserve public education.

We do wish, however, to point out some fundamentals to be borne in mind in the future handling of this and like matters where an approved plan is in operation. Whether to effect a plan, to speed it up, or to otherwise modify it is in the first instance for the school board. This is likewise true as to problems arising in connection with the administration of a plan. The courts are ill equipped to run the schools. Litigants must not ignore school officials, and school officials must not abdicate their function to the courts. They, like the courts, are bound by the Constitution as interpreted by the Su-

preme Court. Cooper v. Aaron, supra. With these principles in mind, this record discloses no problem that could not be resolved between appellants and the school officials based on the judgment of the school officials as educators, with the application of wisdom, forebearance and mutual trust to the educational purpose of schools.

The judgment appealed from is

Affirmed.

RIVES, Circuit Judge (dissenting).

With deference I respectfully dissent. Before expressing reasons, it seems appropriate to state my agreement that all of the parties to this litigation and the district court as well are entitled to the complimentary remarks made of them in the majority opinion. I think, too, that the appellants now before the Court should not be faulted in seeking additional relief because of their willingness, for a period of two years, to permit the Atlanta plan to be tested out without appealing to this Court for any faster relief.

It is apparent from the record that the district court, working patiently with the plaintiffs and with the Atlanta School Board, sought to devise a method by which the first breach in the race barriers might be made. However, it is no criticism of the good faith of the parties involved for me to point out now, as did the Supreme Court in its opinion in Watson, et al. v. City of Memphis, et al., 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed. 529, that:

"It is now more than nine years since this Court held in the first Brown decision, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, that racial segregation in state public schools violates the Equal Protection Clause of the Fourteenth Amendment."

Largely on the basis of what the Court there said, and also because this Court has expressly required other Boards of Education in litigation in this Circuit, see Augustus v. Board of Public Instruc-

tion, 5 Cir., 306 F.2d 862, and Bush v. Orleans Parish School Board, 5 Cir., 308 F.2d 491, to take steps towards desegregation of the schools that go considerably further than was required by the district court in this case, I cannot agree that we should affirm this judgment. For us to do so amounts to a backward step rather than a step consistent with what I consider to be the clear teaching of the Supreme Court's unanimous opinion written by Mr. Justice Goldberg in the Watson case:

"Given the extended time which has elapsed, it is far from clear that the mandate of the second Brown decision requiring that desegregation proceed with 'all deliberate speed' would today be fully satisfied by types of plans or programs for desegregation of public educational facilities which eight years ago might have been deemed sufficient. Brown never contemplated that the concept of 'deliberate speed' would countenance indefinite delay in elimination of racial barriers in schools. * * *."

The essential fact, as disclosed by the record before us, is that the schools of the City of Atlanta do not have a single grade, in either the grammar or high schools, in which Negro children are permitted to become students on the same basis as are white children. In other words, whatever may have produced this result, it is not disputed that it is impossible for a Negro student in the top three grades, which have, under the Atlanta plan, been "desegregated," to enter such desegregated school without being subjected to requirements that *do not apply* to any white student in the grade. This comes about by reason of the fact that, while the basis for first considering applications of a Negro student for a transfer to a white school is the test normally conducted during the school year for all students, both white and Negro alike, the Negro student seeking to transfer is required to meet *standards* based upon an analysis of his tests and also based upon a "personality inter-

view," which do not apply to the white students who are already enrolled in the school, or who come into the grade from a lower grade by reason of having been in a "feeder" system as to which all white students are in white schools and all Negro students are in Negro schools.[1]

As is pointed out by the majority opinion:

"The standard used was that the transferee (the Negro student) had to score a grade at least equal to the average of the class in the school to which transfer was requested."

And, as also pointed out in the majority opinion:

"Each student [transferee] was also given a personality interview by school officials to determine probable success or failure in the new school."

On the face of it, of course, this means that if a Negro student seeks a transfer from Booker T. Washington High School (Negro) into the twelfth or eleventh grade at Northside High School, a white school, the Negro student has to demonstrate from his record at Booker T. Washington that his grade was "at least equal to the average of the class" in Northside, whereas *every* passing student entering that grade from the lower grade in Northside High School would automatically be admitted in such grade. Of course, it would be ridiculous to suggest that before students passing from eleventh grade Northside to twelfth grade Northside could be admitted to the twelfth grade their prior record must have equaled the average of the class in the eleventh grade. It takes no professional testimony to indicate the absurdity of such a requirement. Yet this is precisely the requirement which is imposed on every Negro transfer student. Moreover, so long as an eleventh grade student attains the passing standard required by the school at Northside, he passes into the twelfth grade without being subjected to a "personality interview" by school officials to determine probable success or failure in the twelfth grade.

Even though the appellants did not appeal from the original decision of the trial court approving the transfer plan in the Atlanta Schools, this did not foreclose the right of appellants to complain that, when the plan was actually put into operation, it was operated in a manner that clearly discriminated against the Negro students. Nor is this a criticism of the good faith of the School Board, which may have considered that it had adequate reasons for wishing to impose these higher standards on the first Negro students who were to be admitted into the white schools. This, however, was not within the contemplation of the district court's original order, which expressly provided that the plan was not to be based on consideration of race. It seems to me that the majority opinion justifies the continued approval of the present plan *on the assumption* that it is "not based on consideration of race," because the opinion states:

"* * * it can also be said that there is an option under the Atlanta plan just as there is under the New Orleans and Houston plans, *assuming* the plan is applied to transfers as well as assignments of all new students [which, of course, it is not] in desegregated grades, and is not based on consideration of race [which it plainly is]." (Emphasis added.)

Since the assumption on which the opinion rests is demonstrably not correct, the opinion cannot be logically supported.

The Court of Appeals for the Fourth Circuit, in Green v. School Board of City of Roanoke, 4 Cir., 1962, 304 F.2d

---

1. I use the term "white and Negro schools" in a practical sense. Considerable attention is paid by the trial court and the majority to the fact that the words "Negro" and "White" no longer appear in the literature of the Board of Education. That there are still Negro and white schools, however, is conceded by the appellees. See footnotes 3 and 4, infra.

118, 123, has expressly met and answered this point; that is, whether the requirement of a higher *standard* of performance of Negro students, based on tests uniformly taken by all students, meets even the initial requirement for desegregating a single grade:

> "The requirement that a Negro seeking transfer must be well above the median of the white class he seeks to enter is plainly discriminatory. The board's explanation that this special requirement is imposed on Negroes to assure against any 'who would be failures' is no answer. The record discloses that no similar solicitude is bestowed upon white pupils.
>
> \* \* \*
>
> "The federal courts have uniformly held that such unequal application of transfer criteria [2] is a violation of the Negro pupils' rights under the Fourteenth Amendment."

Green v. School Board of City of Roanoke, 304 F.2d 118, 123, citing Jones v. School Board of City of Alexandria, 4 Cir., 1960, 278 F.2d 72, 77; Dodson v. School Board of City of Charlottesville, Va., 4 Cir., 1961, 289 F.2d 439, 443; and this Court's opinion in Mannings v. Board of Public Instruction, 5 Cir., 1960, 277 F.2d 370, 374–375.

The opinion in the Green case also answers the contention made by appellees and accepted by the majority that an attack on the discriminatory manner of handling the plan must be by each individual student. See 304 F.2d 118, 124. The discriminatory application of the plan can be challenged for the class as can the unconstitutionality of segregated schools.

Counsel for the School Board make the point, which seems somewhat persuasive to the majority, that in all "regular transfers" [3] the transferring student was subjected to the same requirement that he meet the standard equal to the average of the school to which transfer was sought, and that he be subject to a personality interview. This, of course, does not meet the problem at all, because every white student would remain in a white school without having himself subjected to these testing or interview criteria by reason of the fact that every student in the Atlanta schools below the "desegregated" grades goes to school under a dual system,[4] where white children

2. Throughout the discussion in the trial court and throughout the opinion of the majority, emphasis is placed on the fact that the same tests are given to white and Negro children, and that they are all subject to the same grading system. The significant point is not the tests, but the *use that is made of them.* Thus, it is a question of the application of criteria to the Negro student's grades that are not applied to the grades of the white student.

3. The record shows that the only Negro applications for transfer to white schools that were considerd were those submitted between May 1 and May 15 of each year. In addition to these there were many transfers made "informally" during the school year by white students among white schools, or by Negro students among Negro schools. The criteria above discussed were not applied to these informal transfers.

4. While the trial court stated, "neither does the evidence show that defendants are maintaining a 'dual system of school attendance area lines,'" and the majority opinion says, "even if it may be said that there is a dual system in Atlanta, *and the evidence does not so disclose*" (emphasis added), both statements are incorrect. The Superintendent of Schools, who was the only witness, testified as follows on page 90 of the Record:

"Q. And by whom are these administrative lines drawn?

"A. By the area superintendent in co-operation with the school officials, local school officials.

"Q. And these lines serve to delineate the area for particular elementary schools?

"A. Yes, to the degree that it is necessary to balance one school's attendance.

"Q. Now, in the areas where the housing is mixed racially, that is, the areas where Negroes and whites live in the same area, these lines would overlap, so to speak, wouldn't they?

"A. Well, formerly they were drawn separately for white and Negro schools.

"Q. And how are they drawn now?

"A. They are drawn on the basis of the Pupil Placement Law under which

go to white schools and Negro children go to Negro schools.[5] There was only one instance of a formal application of a white girl seeking a transfer from one white school, which was about to be desegregated, to another white school, which thus far had not admitted any Negro students. This, the Board, the district court and this Court held to be an application made clearly outside the purview of the transfer plan, since it stated on the face of the application that the girl sought to transfer from a school which was about to be desegregated, *by reason of the fact of such desegregation.* Thus it is that no good faith application for transfer within the regular period has been made by any white student and none need be made in light of the freedom of transfer by the informal method and by reason of the fact that the "feeder" system from white lower grades automatically guarantees the passage of each student to a white upper grade.

Moreover, entirely beyond the question of whether the present Atlanta plan truly desegregates any grade of school, which I think the record belies, there is the matter of timing which has heretofore come to this Court's attention in the Escambia County case and the Orleans Parish case already mentioned. In the case of Escambia County, the principal city of which is Pensacola, Florida, the Board had proposed a plan at the Court's

direction, which the trial court had approved, providing for applications for transfers in all grades of school, such transfers to be applied to Negro and white students alike upon tests uniformly applied. We concluded that until a start was made in abolishing a dual system of schools, whereby all white children went initially to white schools and all Negro students went initially to Negro schools, no plan of selective transfer from formerly Negro to formerly white schools would satisfy the requirements of deliberate speed under the Brown decision. In 306 F.2d 862, at page 869, this Court said less than a year ago:

"There cannot be full compliance with the Supreme Court's requirements to desegregate until all dual school districts based on race are eliminated. It is probably too late, without undue confusion, to require the elimination as to any grade of such dual districts in time for the 1962 fall term. The plan should, however, provide for the elimination of all dual school districts on racial lines at the earliest practicable time. If it appears too late for such elimination as to any grade in time for the 1962 fall term, then the plan should provide for such elimination as to the first two grades for the *1963 fall term*, and thereafter for such elimination as to at least one

---

we are operating. There has been no change in the elementary situation.

"Q. Now, you say the lines are drawn now pursuant to the Pupil Placement Laws. Is that a state law or is that the plan?

"A. That is the plan.

"Q. And you say the lines are drawn pursuant to that?

"A. The same lines that were in existence in 1960 are in existence at the present time.

"Q. I see.

"A. With variations that have been made. There have been no specific change in those lines.

"Q. And you still have separate lines which relate to the Negro schools and separate lines which would relate to the white elementary schools; is that right?

"A. Roughly, yes."

5. The Superintendent testified at page 92 of the Record:

"Q. You have sort of a feeder system where certain elementary schools would feed into certain high schools?

"A. Yes.

"Q. And, of course, the Negro elementary schools would feed into one of these six Negro high schools?

"A. Yes.

"Q. And the white elementary schools would feed into one of these eighteen white or formerly white high schools?

"A. Right.

"Q. Is that the way these high school students are now assigned to the schools?

"A. The same way, except they are subject to transfer upon request."

316

successive additional grade each school year." Augustus v. Board of Public Instruction, 5 Cir., 1962, 306 F.2d 862, 869.

In Bush v. Orleans Parish School Board, upon its last appearance here, 308 F.2d 491, the *district court*, 205 F.Supp. 893, had already required the Board of Education of Orleans Parish to modify its plan of permitting transfers under the State Pupil Assignment Law, which by that time had applied to two grades of school, by requiring the complete desegregation of the first grade of school beginning September 1962. The order required the abolition of the dual system of schools as to that grade. In an opinion that carefully considered the constitutional and administrative problems involved, *this Court added further requirements* to the effect that in September, 1964, the dual system shall be abolished for the first five grades, and that each year thereafter, as each succeeding higher grade is desegregated, the dual system shall be abolished contemporaneously therewith.

It is clear to me, as it must be to any who read and understand these two decisions by this Court, that if we accept the decision represented by the majority opinion in this case, the Court will have stepped backward from the position it has previously taken after long and mature deliberation, and that this Court will have deliberately required a prompter compliance with the Supreme Court's decision in New Orleans and Pensacola than is being required in Atlanta, a community in which all the evidence and the opinions of the district court and of the majority clearly indicate accommodation to the requirements of the Constitution can be expected to be made with a minimum of difficulty.

Enjoined as we are to give fresh consideration to the element of timing in

these school cases by the Supreme Court's latest pronouncement on the subject in the Watson case, supra, and, following the Watson decision, in Goss, et al. v. Board of Education of City of Knoxville, Tenn., et al., 373 U.S. 683, 83 S.Ct. 1405,[6] 10 L.Ed.2d 632, I cannot concur in a decision of this Court that takes a backward rather than a current, much less forward, step.

I would require the moderate rate of increase prayed for by appellants to the extent of desegregating the classes to include the eighth and ninth grades in 1963, and the fifth, sixth and seventh grades in 1964. This is roughly parallel to what we required in Bush.

On Petition for Rehearing

PER CURIAM.

It is ordered that the petition for rehearing filed in the above entitled and numbered cause be, and the same is hereby denied.

The record before the court in this case did not relate to any practices having to do with transfers and assignments for the 1963–64 school term. We referred to certain deficiencies found in the Atlanta plan on that record, and affirmed on the premise that such deficiencies would be adjusted by those having charge of the schools, or upon their failure, by the District Court.

The corrective action necessary in light of the deficiencies will entail the application of the plan in an even handed manner without regard to race to all assignments of pupils new to a school for admission in a desegregated grade in that school; and to all transfers whether formal, informal or otherwise. Personality interviews to determine probable success or failure in the schools to which transfer and assignment is sought may not be utilized where such

6. In construing language of a transfer plan for the schools of Knoxville, Tennessee, and of Davidson County, Tennessee, the Court said:
 "Now, however, eight years after his decree was rendered and over nine years after the first Brown decision, the context in which we must interpret and apply this language to plans for desegregation has been significantly altered. Compare Watson v. City of Memphis, supra."

a practice relates only to Negro pupils as was the case. No standard requiring that a transferee score a grade on scholastic ability and achievement tests equal to the average of the class in the school to which transfer is sought may be utilized, nor may any scholastic requirement whatever be used where applied only to Negro students seeking transfer and assignment as was the case in Atlanta in the administration of the plan approved by the District Court. The opinion is modified to make it clear that this corrective action must apply to transfers and assignments for the 1963–64 school term to the extent, if any, that the practices giving rise to the deficiencies may have been continued in use.

RIVES, Circuit Judge, dissents.